COMMONWEALTH *VS.* JOHN SPEARE ALPHAS.

Hampden. March 4, 1999. - July 7, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Stalking. Practice, Criminal,* Instructions to jury, Assistance of counsel, Cross-examination by prosecutor, Argument by prosecutor. *Evidence,* Judicial discretion, Relevancy and materiality, Cross-examination, Credibility of witness. *Words,* "Repeatedly."

The violation of an agreed-to "stay-away" order in a divorce judgment entered pursuant to the Probate and Family Court's authority under G. L. c. 208, § 18, was sufficient to support a conviction of stalking in violation of G. L. c. 265, § 43 (*b*), inserted by St. 1992, c. 31. [11-12]

Discussion of the standard of review in criminal cases first enunciated by this court in *Commonwealth v. Freeman,* 352 Mass. 556, 563-564 (1967), viz., whether an error not objected to by the defendant at trial creates a substantial risk of a miscarriage of justice that warrants the grant of a new trial. [13] GREANEY, J., concurring. FRIED, J., concurring, with whom LYNCH, J., joined.

At a criminal trial, the judge's erroneous instructions, to which the defendant did not object, did not create a substantial risk of a miscarriage of justice in circumstances in which the evidence against the defendant was overwhelming, and the errors did not raise any inference that the jury verdict might have been different. [13-15]

In a criminal case, the defendant did not demonstrate that his trial counsel provided ineffective assistance. [16]

At the trial of a complaint alleging stalking in violation of G. L. c. 265, § 43, the judge correctly excluded as irrelevant evidence of the victim's prior applications for protective orders. [16-17]

No substantial risk of a miscarriage of justice arose from the prosecutor's improper cross-examination of the defendant that called thirteen times for the defendant's assessment of the credibility of other witnesses, in light of the overwhelming evidence of guilt. [17-20]

In a criminal case, nothing in the prosecutor's closing argument created a substantial risk of a miscarriage of justice. [20]

COMPLAINT received and sworn to in the Palmer Division of the District Court Department on August 10, 1995.

A pretrial motion to dismiss was considered by *Kenneth J. Cote, Jr.,* J., and the case was tried before *Nancy Dusek-Gomez,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Abraham J. Mayers* for the defendant.

*Deborah Ahlstrom,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. After a jury trial, the defendant was convicted of four counts of stalking in violation of G. L. c. 265, § 43, a statute which proscribes two distinct types of stalking, stalking by harassment and stalking by following. On appeal, the defendant claims error in (1) the denial of his pretrial motion to dismiss; (2) certain jury instructions; (3) the exclusion of certain evidence; (4) the prosecutor's conduct of cross-examination; and (5) remarks made by the prosecutor during his closing argument. The defendant also contends his trial counsel was ineffective. We transferred this case from the Appeals Court on our own motion. We affirm both the denial of the motion to dismiss and the convictions.

1. *Facts.* The jury were warranted in finding the following facts. The defendant and the victim were married in April, 1988, and were separated in May, 1991. They had one child at the time of their divorce in May, 1992. The final divorce decree became absolute on August 10, 1992. In the judgment, the parties agreed the defendant would "not follow [the victim] or harass her at her home or her place of employment," and the judgment prohibited nonemergency verbal communication, specifically forbidding harassing telephone calls.[1]

The defendant's violent and threatening behavior began even before the final divorce judgment was entered. Throughout 1992, he harassed the victim, expressing his displeasure with her involvement with her fiancé, and verbally abused her by referring to her by sexually explicit slurs. In June, 1992, the defendant arrived at her house to visit their child on a nonvisitation day. Sometime later, he scared the victim by following her home from work. In September, she saw the defendant with his girlfriend at a shopping mall, and they both followed her between stores. The next day, the victim observed the defendant

---

[1]The judgment of divorce nisi read in part: "[B]y agreements of said parties said defendant be and hereby is prohibited from imposing any restraint on the personal liberty of said plaintiff; he shall not follow her or harass her at her home or her place of employment; there is to be no verbal communication between said parties except for an emergency concerning the minor child. Both parties are restrained from making harassing telephone calls."

driving back and forth in front of her home. In December, 1992, the defendant inexplicably appeared at two of their child's doctor's appointments.

The defendant's harassing behavior continued in 1993. In the spring, the victim and a coworker observed the defendant looking at her through her office window from across the street with binoculars. He did this at least four times. On another night, he followed her and a friend to two bars and then to her house, where he threatened to kill her. Another time he scared her by saying, "A single mother alone like this, with kids, strange things could happen." One day, after picking up their daughter, the defendant, while verbally harassing the victim, backed his vehicle onto her lawn, leaving tire tracks. He carried a gun with him to the visitation pickups, and told their child at least a dozen times in the victim's presence, "Somebody could get hurt."

The defendant's conduct became more threatening in 1994. In January, he again appeared unexpectedly at their child's doctor's office. The next day, he was abusive toward her on the telephone. In May, he verbally abused her once again, calling her a "bitch" and a "home wrecker." In June, the defendant twice warned her to "be careful" because "[y]ou never know what could happen to a single mother alone with two girls in the house." In early August, while the victim and her fiancé were shopping for engagement rings, she observed the defendant watching them through the store window. He then followed them after they left the store for approximately three miles. Twice in October he threatened her, once saying: "You'll get yours you bitch," and "You're going to get yours and I've had it with this shit." In November, the defendant again followed the victim and her family as they drove on the highway for several miles.

The defendant again followed and harassed the victim on several occasions in 1995. Five times between March and June, the defendant verbally abused the victim by telephoning her or confronting her at home or in the community. In three of these encounters, he threatened to kill her, stating once: "I'm going to kill you" and "You're going to see. I'm going to get you."

In May, the defendant was at their child's school when the victim picked up their child. He then followed her to a shopping mall. On Mother's Day, he followed the victim's family to church, entered the church during the service and stared at her,

then, when the family left in an attempt to get away from him, he followed them to a restaurant. In late June, the defendant followed the victim and her family on the highway for at least twenty miles, driving behind and beside their car. They feared he was going to use his gun because he kept one hand hidden as he drove alongside them.

The defendant used a scanner to listen to her telephone calls and bragged about this to a friend. Beginning in June, 1995, the defendant also videotaped his encounters with the victim.

2. *The defendant's motion to dismiss.* Prior to trial, the defendant moved to dismiss two counts, those for stalking by harassment in violation of a court order and for following in violation of a court order, because there was no order in effect against him when he was alleged to have committed the acts. He claimed that he could not be guilty under G. L. c. 265, § 43 (*b*), without violating one of the orders listed in the statute.[2] The District Court judge denied the defendant's motion because he concluded that the stay-away order in the divorce judgment was the equivalent of a G. L. c. 208, § 18, order, and violation of it satisfied § 43 (*b*). We largely agree with the judge, and conclude that it was not error to deny the defendant's motion.

The defendant was in violation of an order that was part of the divorce judgment. As discussed in a recent case, see *Champagne* v. *Champagne*, 429 Mass. 324, 326 (1999), this order was entered pursuant to the Probate and Family Court's authority under G. L. c. 208, § 18, which provides, in part, that "the [Probate and Family Court] may make such further order as it deems necessary to protect either party or their children, to preserve the peace or to carry out the purposes of this section relative to restraint on personal liberty." By doing what he agreed not to do, the defendant violated § 18, one of the

[2]General Laws c. 265, § 43 (*b*), inserted by St. 1992, c. 31, in part, read:

"Whoever commits the crime of stalking in violation of a temporary or permanent vacate, restraining, or no-contact order or judgment issued pursuant to sections eighteen, thirty-four B, or thirty-four C of chapter two hundred and eight; or section thirty-two of chapter two hundred and nine; or sections three, four, or five of chapter two hundred and nine A; or sections fifteen or twenty of chapter two hundred and nine C or a temporary restraining order or preliminary restraining or permanent injunction issued by the superior court, shall be punished . . . ."

enumerated orders that supports a conviction of stalking in violation of a court order under § 43 (b).[3]

3. *Jury instructions on stalking.* Under G. L. c. 265, § 43 (a), inserted by St. 1992, c. 31, one who "willfully, maliciously, and repeatedly follows or harasses another person and who makes a threat with the intent to place that person in imminent fear of death or serious bodily injury shall be guilty of the crime of stalking." The statute addresses both stalking by harassment and stalking by following.[4]

In *Commonwealth* v. *Kwiatkowski*, 418 Mass. 543 (1994), we concluded that the portion of the stalking statute that addressed harassing conduct was unconstitutionally vague because it did not "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." *Id.* at 547, quoting *Opinion of the Justices*, 378 Mass. 822, 826 (1979). The specific problem was ambiguity in the word "repeatedly" within the definition of harassment, which confused whether a violation required one series of acts alone or multiple patterns of conduct. See *id.* at 546. We interpreted the statute in a manner that resolved any ambiguity, and concluded that the new definition was to be applied after the date the opinion was released, August 3, 1994.[5] Because the statute contemplates two different types of stalking, we noted that the prospective definition we announced in *Kwiatkowski* applied only to stalking by harassment, not to stalking by following. See *id.* at 546 ("To be guilty under the 'harassment' aspect, as opposed to the 'following' aspect . . .") and *id.* at 547 (addressing only "the portion of the stalking statute concerning harassing conduct").

(a) *Stalking by harassment.* The defendant claims the judge

---

[3]The defendant could not be prosecuted, however, under G. L. c. 208, § 34C, which requires law enforcement officers to serve the defendant with a copy of the order, and for the order to explicitly state that "VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE." Satisfaction of the extra-statutory protections under § 34C is not a prerequisite to prosecution under the stalking statute. Violation of § 34C is a separate offense from one under § 43 (b). Section 34C states that "[c]riminal remedies provided herein are not exclusive and do not preclude any other available civil or criminal remedies."

[4]In addition, under G. L. c. 265, § 43 (b), stalking by harassment and stalking by following are lesser included offenses of stalking by harassment in violation of a court order and stalking by following in violation of a court order, respectively. See note 2, *supra*.

[5]This definition has been preempted by subsequent amendments to the statute. See St. 1996, c. 298, §§ 11, 12.

erred by not instructing the jury that he could not be convicted of stalking by harassment or of stalking by harassment in violation of a court order, for acts committed prior to August 4, 1994. We agree with the defendant that the judge should so have instructed the jury, and that his convictions for stalking by harassment and for stalking by harassment in violation of a court order could only be based on offenses committed after August 3, 1994. See *id.* at 547. Because the defendant did not object to the jury instructions, we must determine whether the error created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Delaney*, 425 Mass. 587, 595-596 (1997), cert. denied, 522 U.S. 1058 (1998), and cases cited; *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

We take this opportunity to address the standard of review applicable to unpreserved trial errors in cases other than capital cases on direct appeal, the so-called *Freeman* standard, which recently has been the subject of comment in our courts. See, e.g., *Commonwealth* v. *Eason*, 43 Mass. App. Ct. 114 (1997), *S.C.*, 427 Mass. 595 (1998). An error creates a substantial risk of a miscarriage of justice unless we are persuaded that it did not "materially influence[]" the guilty verdict. *Commonwealth* v. *Freeman*, *supra* at 564. In making that determination, we consider the strength of the Commonwealth's case against the defendant (without consideration of any evidence erroneously admitted[6]), the nature of the error, whether the error is "sufficiently significant in the context of the trial to make plausible an inference that the [jury's] result might have been otherwise but for the error," *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986), and whether it can be inferred "from the record that counsel's failure to object was not simply a reasonable tactical decision." *Id.*[7] Applying this standard to this case, we

---

[6]Excluding improperly admitted evidence from our consideration of the Commonwealth's case is necessary because this evidence should not weigh against the defendant where it would not have been admitted but for the error. For instance, a substantial risk of a miscarriage of justice could still exist where a defendant is convicted based on compelling evidence, none of which should have been admitted at trial. See *Commonwealth* v. *Freeman*, *supra* at 563 (substantial risk of miscarriage of justice exists where "court would have unanimously ordered a new trial if an exception had been saved"). Cf. *Commonwealth* v. *Amirault*, 424 Mass. 618, 650 (1997), quoting *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986).

[7]The standard of review for objected-to trial errors, by contrast, concerns

conclude that the erroneous instructions do not warrant reversal of the convictions on those counts.

Failure to instruct the jury to consider only acts committed after August 3, 1994, in their deliberations on the counts of stalking by harassment and stalking by harassment in violation of a court order was error. Acts prior to August 4, 1994, cannot form the basis of his conviction of either of these two counts. See *Commonwealth* v. *Kwiatkowski, supra* at 547.

Here, the case against the defendant was virtually irrefutable. Facts in the record support the convictions based solely on acts committed after the *Kwiatkowski* case. Specifically, the jury were warranted in finding the defendant harassed the victim at least eight times after August 3, 1994. This "campaign of harassment," *Commonwealth* v. *Matsos*, 421 Mass. 391, 399 (1995), included two threats in October, 1994; five instances of harassment in 1995; and the harassment of the victim and her family on Mother's Day, 1995.

As to the nature of the error, the erroneous instructions were problematic because the jury never should have considered the evidence of pre-August 4 behavior. That evidence, however, was cumulative of correctly admitted evidence that was clearly sufficient to convict the defendant. Given the amount and strength of the evidence of post-August 3 behavior, we cannot conclude the error raises an inference that the jury verdict might have been otherwise. We also are unable to infer from the record that defense counsel's failure to object to the jury instructions was a reasonable tactical decision.

In sum, given the formidable evidence of harassment perpetrated by the defendant after August 3, 1994, the judge's failure to prohibit the jury from considering acts occurring prior to the *Kwiatkowski* decision did not create a substantial risk of a miscarriage of justice.

(b) *Stalking by following.* The defendant argues the judge erred when instructing the jury concerning the charge of stalking by following and by following in violation of a court order.

whether "the conviction is sure that the error did not influence the jury, or had but very slight effect . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

Because the defendant did not object to the instruction, we also review this claim to determine if it created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Delaney, supra* at 595-596; *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

Specifically, the defendant challenges the judge's instructions concerning the definition of "repeatedly." In order to convict the defendant under the following prong of the stalking statute, the jury had to find that he "willfully, maliciously, and repeatedly follow[ed]" the victim. G. L. c. 265, § 43 (*a*), inserted by St. 1992, c. 31. The judge told the jury that "[t]he term repeatedly means, at least twice. Therefore, the Defendant must have followed [the victim] more than two times." These instructions were confusing and contradictory because it is not·clear if the jury were told to decide whether the defendant followed the victim two times or whether he followed her three or more times.

The judge should have instructed the jury that the Commonwealth had to prove there were more than two incidents of following. In *Commonwealth* v. *Martinez*, 43 Mass. App. Ct. 408, 411 (1997), the Appeals Court, interpreting stalking by following under G. L. c. 265, § 43, concluded that "repeatedly" "require[s] more than two incidents of following." We agree with the defendant that the jury should have been instructed to determine whether the defendant followed the victim more than two times because the defendant is entitled to the benefit of any ambiguity in the statute. See *Commonwealth* v. *Wotan*, 422 Mass. 740, 742 (1996) (concerning proper definition of "repeatedly" in the statute prohibiting harassing telephone calls).

Despite the judge's failure to instruct the jury properly, any error in jury instructions could not have created a substantial risk of a miscarriage of justice because the defendant's convictions were based on more than two incidents of following. Here, evidence of following was overwhelming. The jury were warranted in finding the defendant followed the victim at least eight times.[8] The convictions of the defendants in *Commonwealth* v. *Wotan, supra,* and *Commonwealth* v. *Martinez, supra,* by contrast, were based on only two incidents so the confusion in the instruction in those cases warranted reversal of the convictions. Such is not the case here.

---

[8]Because *Commonwealth* v. *Kwiatkowski*, 418 Mass. 543 (1994), addressed only stalking by harassment, the jury could consider evidence of stalking by following before and after August 4, 1994.

4. *Ineffective assistance of counsel.* The defendant asserts that his trial counsel was ineffective because he failed to object, first, to the jury instructions that did not address the August 3, 1994, distinction based on the *Kwiatkowski* case, and second, to the prosecutor's closing argument in which, the defendant alleges, he stated both that the defendant could be convicted of acts occurring as long ago as 1992 and that the jury were warranted in considering the cumulative effect of all the defendant's conduct, including what he did prior to August 4, 1994. He seeks reversal of his convictions based on trial counsel's performance.

We review these claims of ineffective assistance of counsel to determine whether defense counsel's conduct fell "measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). As to the defendant's first point, defense counsel was not deficient for failing to object to the prosecutor's closing statement. The prosecutor did not stress events prior to August 4, 1994, in relation to the harassment counts, and behavior prior to that date was admissible on the following counts. As to his second claim, an ordinary lawyer representing this client would have understood *Kwiatkowski* and would have objected to the lack of an instruction, in regard to the harassment counts, concerning acts prior to August 4, 1994. Any potential prejudice resulting from defense counsel's performance, however, is immaterial because of our conclusion that the defendant would have been convicted even if the jury had considered only evidence of acts occurring after August 3, 1994. See *Commonwealth* v. *Egardo,* 426 Mass. 48, 52 (1997), quoting *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 (1977) ("there ought to be some showing that better work might have accomplished something material for the defense").

5. *Evidence of prior applications for protective orders.* The defendant alleges the judge erred by precluding him from questioning the victim on cross-examination about her prior applications for protective orders. He asserts that evidence of prior applications was admissible to demonstrate his state of mind, and that it would have tended to show that he did not know his conduct was improper because his previous acts had not convinced other courts to issue protective orders.

Trial judges have wide discretion to determine whether evidence is relevant or unreasonably prejudicial. See *Com-*

*monwealth* v. *Fernandes*, 427 Mass. 90, 96 (1998), citing *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990); *Commonwealth* v. *Marrero*, 427 Mass. 65, 67-68 (1998), and cases cited. The judge did not abuse her discretion here because evidence that another court did not grant a protective order is irrelevant to determine whether the defendant is guilty of stalking in this case. The only order relevant to the charges here was the order contained in the divorce judgment. The victim's attempts to secure a protective order were irrelevant to the issue whether the defendant was aware that he was violating the order in the divorce judgment. In addition, the judge was warranted in excluding the evidence because it would have diverted the jury's attention to a collateral matter, circumstances surrounding applications for protective orders.

6. *Cross-examination of the defendant.* The Commonwealth admits the prosecutor should not have asked the defendant on cross-examination to assess the credibility of the Commonwealth's witnesses. Because the defendant did not object to the prosecutor's questions, we review the alleged error to determine whether it created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Whelton*, 428 Mass. 24, 26 (1998).

The prosecutor violated the "fundamental principle that 'a witness cannot be asked to assess the credibility of his testimony or that of other witnesses.' " *Commonwealth* v. *Triplett*, 398 Mass. 561, 567 (1986), quoting *Commonwealth* v. *Dickinson*, 394 Mass. 702, 706 (1985). In *Triplett*, a new trial was ordered, pursuant to G. L. c. 278, § 33E, because the defendant was questioned about the credibility of his mother, the only witness to the murder. We emphasized the additional impropriety of the Commonwealth's "[p]itting mother against son," by forcing the defendant to comment on his own mother's testimony. *Id.* at 567. We concluded that the questioning created a substantial likelihood of a miscarriage of justice, *id.* at 564, because the critical issue before the jury was "whether to accept the version [of events] given by the mother or that given by her son." *Id.*

The record reveals that the defendant was questioned inappropriately thirteen times. The questioning can be categorized into three different groups. First, on seven occasions the

prosecutor asked the defendant whether an event had happened.[9] These are similar to questions we concluded were not prejudicial in *Commonwealth* v. *Wright*, 411 Mass. 678, 687 (1992). In that case, the prosecutor read a witness's statements made during a telephone call, and asked the defendant about the truth of each statement. We concluded that "[no harm] came from what the prosecutor did. He could have asked the defendant, point by point, about the truth of each fact asserted in the statement." *Id.*

Four questions comprise a second group of instances where the prosecutor asked the defendant if what another witness had stated was correct.[10] These are similar to questions from other cases that did not create a substantial risk of a miscarriage of justice because they "did not create an issue of credibility between the defendant and other witnesses." *Commonwealth* v. *Richenburg*, 401 Mass. 663, 674 (1988). See *id.* at 673 n.4 (listing examples of questions posed). It is not improper "for the prosecutor to point out, through this line of questioning, that there were inconsistencies between the defendant's testimony and that of [a witness], so long as the defendant was not asked

---

[9]Two examples of these questions follow:

*Q.:* "Yeah. But in the spring of 1993, [the victim] testified that in the spring of 1993 you were watching her through a window when she was at work. You heard her say that, right?"

*A.:* "I heard her say that?"

*Q.:* "Okay. But your testimony is that never happened?"

*A.:* "True."

" . . .

*Q.:* "And she says she saw you looking at her across the street too?"

*A.:* "Yes."

*Q.:* "Never happened, right?"

*A.:* "It never happened."

[10]An example of these questions is:

*Q.:* "So when [the victim and her husband] indicate that they saw you have a gun in your belt or show them the gun, they were wrong?"

*A.:* "Yes they were wrong."

to assess the credibility of the [witness's] testimony." *Commonwealth* v. *Johnson*, 412 Mass. 318, 327-328 (1992).

In a third group, the prosecutor twice asked the defendant whether another witness lied in their prior testimony.[11] The questioning was less severe than in *Commonwealth* v. *Long*, 17 Mass. App. Ct. 707 (1984), where the Appeals Court ordered a new trial because, in part, the prosecutor asked "at least a hundred improper questions on a cross-examination which covered over one hundred pages of the transcript." *Id.* at 708. The present case is more similar to others in which a new trial was not ordered because the prosecutor asked the defendant

---

[11]The two questions were:

*Q.*:   "Now, [the victim and her friend] testified about an incident at [a restaurant] in the summer of 1993, in which they walked in or they were there and you walked in and were looking at them."

*A.*:   "They testified to that, yes."

*Q.*:   "All right. And you have no recollection of that?"

*A.*:   "I was not there."

*Q.*:   "You were not there?"

*A.*:   "No I wasn't."

*Q.*:   "*They must be lying?*"

*A.*:   "I've never been to [that restaurant]."

"   . . .

*Q.*:   "Now [the victim] indicated you were looking through the window of the jewelry store?"

*A.*:   "That's what she said."

*Q.*:   "Do you recall that?"

*A.*:   "It didn't happen. It wasn't me."

*Q.*:   "It didn't happen. She (inaudible)?"

*A.*:   "She certainly did."

*Q.*:   "*[Her husband] made that up?*"

*A.*:   "I don't think his testimony was the same as hers."

only one impermissible question. See *Commonwealth* v. *Elam*, 412 Mass. 583, 586 (1992); *Commonwealth* v. *Ward*, 15 Mass. App. Ct. 400, 401 n.2 (1983). Any potential harm to the defendant was lessened because he was able to respond without characterizing the other witness's testimony as truthful or false. See *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 515 (1992) (no substantial likelihood of miscarriage of justice where defendant had option not to allege witness was lying); *Commonwealth* v. *Elam*, *supra* (no prejudicial error where defendant, when asked if witness was lying, explained his own actions and did not speculate).

In sum, we are convinced from our review of the record that the prosecutor's questioning was more likely "designed to serve the proper purpose of 'elicit[ing] an explanation of differences from prior testimony,' " *Commonwealth* v. *Dickinson*, 394 Mass. 702, 707 (1985), quoting *Commonwealth* v. *Donovan*, 17 Mass. App. Ct. 83, 88 (1983), than it was intended to "transform[] the interrogation stage of the trial into the phase traditionally reserved for argument and summation." *Commonwealth* v. *Long*, *supra* at 709-710. The prosecutor's questioning in this case troubles us, but we cannot say that, when faced with overwhelming evidence against the defendant, the questions create a substantial risk of a miscarriage of justice.

7. *The prosecutor's closing statement.* Nothing in the defendant's arguments concerning the prosecutor's closing statement provides a sufficient reason to order a new trial or a reversal of his convictions. Because the defendant did not object to the prosecutor's closing argument, we have reviewed the prosecutor's statement to determine if it created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Pearce*, 427 Mass. 642, 646 (1998), citing *Commonwealth* v. *Loguidice*, 420 Mass. 453, 455-456 (1995). We conclude that it did not. As discussed above, the prosecutor did not relate events prior to August 4, 1994, to the harassment counts, and he was permitted to address that behavior as it applied to the following counts.

*Judgments affirmed.*


GREANEY, J. (concurring). I agree with the court's statement of the tests for determining the existence of a substantial risk of a miscarriage of justice and prejudicial error. *Ante* at 13 & n.7. I

write separately to explain my understanding of some of the differences between the tests.

Appellate courts do not sit as triers of fact. Any test concerning reversible error that requires an appellate court to determine whether a defendant is actually innocent is conceptually flawed because such a test converts the appellate function into the jury function in violation of their different purposes. I do not accept recent pronouncements of Federal law that may suggest the contrary. The correct formulation of basic principles in this area is the one stated by Justice Rutledge in *Kotteakos* v. *United States*, 328 U.S. 750, 763-764 (1946), in these terms:

> "Some aids to right judgment may be stated more safely in negative than in affirmative form. Thus, it is not the appellate court's function to determine guilt or innocence. . . . Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. Appellate judges cannot escape such impressions. But they may not make them sole criteria for reversal or affirmance. Those judgments are exclusively for the jury . . . . But this does not mean that the appellate court can escape altogether taking account of the outcome. To weigh the error's effect against the entire setting of the record without relation to the verdict or judgment would be almost to work in a vacuum. . . . In criminal causes that outcome is conviction. This is different, or may be, from guilt in fact. It is guilt in law, established by the judgment of laymen. And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting." (Citations omitted.)

The tests expressed by the Court are underpinned by these fundamental principles that distinguish appellate from trial work.

The substantial risk of a miscarriage of justice test is based on the settled rule that errors not raised or preserved by a defendant at trial will not be considered on appeal. The reasons for this rule were well stated by the Oregon Court of Appeals in *State* v. *Applegate*, 39 Or. App. 17, 21 (1979), as follows:

"There are many rationales for the raise-or-waive rule[1]: that it is a necessary corollary of our adversary system in which issues are framed by the litigants and presented to a court; that fairness to all parties requires a litigant to advance his contentions at a time when there is an opportunity to respond to them factually, if his opponent chooses to; that the rule promotes efficient trial proceedings; that reversing for error not preserved permits the losing side to second-guess its tactical decisions after they do not produce the desired result; and that there is something unseemly about telling a lower court it was wrong when it never was presented with the opportunity to be right. The principal rationale, however, is judicial economy. There are two components to judicial economy: (1) if the losing side can obtain an appellate reversal because of error not objected to, the parties and public are put to the expense of retrial that could have been avoided had an objection been made; and (2) if an issue had been raised in the trial court, it could have been resolved there, and the parties and public would be spared the expense of an appeal."

The substantial risk of a miscarriage of justice test constitutes our exception to this aspect of the finality rule. The test requires a comparative analysis of the considerations set forth in the court's opinion to decide whether the jury might have reached a different result had the error not occurred. Each case on appeal will have its own peculiar characteristics, and no all-encompassing checklist can be developed. But, as an authority on criminal procedure has observed with respect to the counterpart Federal "plain error" doctrine, "[t]here are . . . certain factors which clearly have a positive influence on the application of the doctrine. The more closely balanced the evidence, for example, the greater the likelihood that an error otherwise not viewed as sufficiently patent or fundamental will meet the standard. Courts also acknowledge that errors of

---

[1]The use of the word "waiver" in this shorthand expression is not correct. Waiver involves the intentional relinquishment of a known right. A defense lawyer who does not object to an error at trial does not do so intentionally and knowingly (except in rare instances where a tactical judgment is made). The lack of an objection to, or a failure to preserve the right of appeal on, a trial error is usually the product of defense counsel's inadvertence or ignorance. The "raise or waive" rule is more properly characterized as a "raise or lose" rule.

constitutional magnitude will be noticed more freely under the plain error doctrine than violations of most statutes or common law standards. Various rulings also suggest that the doctrine is more likely to be applied where there might be a good reason for the lack of objection below,[2] or where the error could not have been remedied by the trial judge even if called to his attention. On the other side, the doctrine is less likely to be applied where the error could have been readily corrected by an objection at trial, or where such an objection may have led the government to introduce additional evidence on the issue." 3 W.R. LaFave & J.H. Israel, Criminal Procedure § 26.5, at 256-257 (1984). As a general proposition, to create a substantial risk of a miscarriage of justice, the error must be serious when considered in terms of its injurious effect or influence on the jury's verdict. The defendant bears the burden of showing that the error could have had such an impact, and the appellate court will not apply the test to grant the defendant relief in the absence of substantial agreement by the appellate panel that a new trial is necessary to correct a conviction that leaves the feeling that an injustice has occurred and to assure that trials are fundamentally fair.

The prejudicial (or harmless) error test stated by the court is that drawn from the *Kotteakos* case. The test has been applied in many of our decisions. As with the substantial risk of a miscarriage of justice test, the prejudicial error test calls for a comparative analysis of the circumstances in a particular case. The appellate court, attentive to the fact that the defendant's rights at trial have been preserved, inquires whether there is a reasonable possibility that the error might have contributed to the jury's verdict. The burden of showing the absence of error is on the Commonwealth, see *Commonwealth* v. *Hanger*, 377 Mass. 503, 510 (1979), and cases cited, and the Commonwealth also bears the risk of doubt when any exists as to the error being nonprejudicial. This test is quantitatively more favorable to a defendant than the substantial risk of a miscarriage of justice test. There are, of course, considerable permutations of both tests that need not be discussed here. It is enough to state that the tests differ in their substance, and each serves a discrete function in the criminal justice process.

---

[2]The authors here cite as an example *United States* v. *Berry*, 627 F.2d 193, 199 (9th Cir. 1980), cert. denied, 449 U.S. 1113 (1981), where an objection was not made because it might have exaggerated the prejudice caused by the initial error.

FRIED, J. (concurring, with whom Lynch, J., joins). On the ground that the judge's failure to instruct in accordance with the law did not create a substantial risk of a miscarriage of justice, the court spares the victim the further terror of a retrial. I disagree only with the court's description of what the standard of substantial risk of a miscarriage of justice means and with the instructions it issues as to the application of that standard in future cases.

The defendant has had a trial in which his guilt was determined according to rules of law in which he himself acquiesced. In the terminology of our law, he has waived his objections to any errors in the charge. When there has been such a waiver, a miscarriage of justice has only one meaning: that there is a substantial risk that an innocent person has been convicted. There is no such risk here.

It literally makes no sense to proclaim a doctrine of waiver — to insist, as our rules of criminal procedure clearly do, that a defendant make his objections and propose his rulings of law at trial — and then to consider whether there should be a new trial on the basis of an error in instructions that the defendant could have raised but did not. The rule the court proclaims today (but perhaps does not in reality apply) threatens finality and the orderly procedure that the rule of waiver is intended to enforce.[1] The reason that claims not timely made at trial are deemed waived is not to make of the trial some kind of arbitrary obstacle course, but to assure that the judge has the opportunity to manage the first and, it is to be hoped, the only trial in a correct and lawful way. Claims not brought to the judge's attention cannot be ruled on at trial, and the errors they identify cannot be cured. The court's proposal threatens to undermine the goal of finality by inviting such untimely claims. The stringent-sounding threshold of substantial risk gives uncertain assurance against that danger. The court's formulation makes the difference between the miscarriage of justice standard and the harmless error standard, which applies to fully preserved claims, one of such imperceptible degree as to provide no discipline at all. A rational system relies not on such uncommunicable and therefore arbitrary distinctions of degree — distinctions that effectively

---

[1]The classic statements are Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142 (1970), and Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441 (1963).

leave trial judges and the courts that review them at sea on an ocean of discretion — but on distinctions of kind, distinctions capable of statement, review, and consistency. In the case of the harmless error standard, we ask if we can be quite sure that the outcome of the trial would have been the same had the error not been committed. In the case of the miscarriage of justice standard, properly understood, we ask whether there is a substantial risk that an innocent person has been convicted. Both standards require an appellate court to second-guess the original trial determination, and neither is mechanical; in these respects they do not differ. But they differ in respect to the questions they ask.

The formulation of miscarriage of justice the court today promulgates not only threatens the concept of waiver, and with it the finality of error-free trial court proceedings (error-free in the sense that no objections were improperly denied), it makes no sense when fitted into the rest of our body of criminal jurisprudence. The court's formulation, in effect, makes G. L. c. 278, § 33E, review available in every criminal case. Section 33E provides that, in capital cases, the Supreme Judicial Court must review the whole record and consider even matters not raised below. Under G. L. c. 278, § 33E, "a new trial is called for unless we are substantially confident that, if the error had not been made, the jury verdict would have been the same." *Commonwealth* v. *Ruddock*, 428 Mass. 288, 292 n.3 (1998). It is quite clear that we consider such unpreserved errors for the effect they may have had on the outcome of the trial and not just in terms of guilt and innocence. If there is a difference between the standard the court sets out today and the § 33E standard, it is, as I have said, only an ineffable difference of degree, which provides no discipline, assures no regularity, invites arbitrary distinctions, and grants uncertain discretion. With respect to both stalking charges in this case, the judge erred in instructing the jury. Likewise, as to both charges, there was so much evidence against the defendant that a reviewing court need have no doubt that the defendant was guilty. Although the court says that, in affirming these convictions, it is asking what effect the error had on an actual jury, this is an after-the-fact speculation about the effect on a hypothetical jury. It is mere wordplay to suggest that such an inquiry respects the role of an actual jury while the guilt or innocence standard usurps that role. Except for ineffable distinctions of degree, the

reviewing court's process of judgment is the same — but the guilt or innocence standard describes that process more candidly. The court's reference to the strength of the Commonwealth's case confirms my view.

To be sure, the damage is worse if the court's conception of a miscarriage of justice is applied to new trial motions as well as to direct appeals, because the lapse of time and corresponding prejudice to the Commonwealth are likely to be greater in the case of new trial motions. But in both cases, there must be a retrial to correct an error the defendant's timely objection might have avoided initially. That is why our cases do not distinguish clearly and consistently between the application of the doctrine of waiver in the two situations. Because the doctrine of waiver is the same in both circumstances, the formulation the court sets out today is at least in tension with the statutory requirement that a court considering a new trial motion in a capital case may consider only new and substantial questions. See G. L. c. 278, § 33E. Claims that might have been raised previously are waived and may not be considered by the court reviewing the motion. See, e.g., *Commonwealth* v. *Burnett*, 428 Mass. 469, 473-474 (1998). The all-purpose definition of miscarriage of justice the court promulgates today recognizes no such force for waiver. Moreover, in deciding whether a question raised in a new trial motion is new, we have been at great pains to ask whether the issue the defendant seeks to raise is really new — that is, whether it was sufficiently foreshadowed at an earlier stage in the proceedings that it would not have required clairvoyance to anticipate a later definitive ruling. See, e.g., *Commonwealth* v. *Souza*, 44 Mass. App. Ct. 238, 241 (1998). Only if it is new in this rather demanding sense will we conclude that it has not been waived. But why would we go through this often painstaking dissection of the course of prior law if the rule of (non) waiver the court promulgates today really were the law?

The court puts neon lights around how harmful and disruptive the standard it promulgates today really is by referring to its potential application to cases, unlike this one, in which the nonpreserved error related not to a jury instruction but to evidence that might, on proper objection, be inadmissible. Those cases are much more frequent, and the mischief the court does today far more virulent in them. The court states that if evidence was introduced which, had a proper objection been made, should

not have been introduced, the miscarriage of justice standard must be applied as if that evidence were not in the case. Endorsing a recent decision of the Appeals Court, *Commonwealth* v. *Eason*, 43 Mass. App. Ct. 114 (1997), *S.C.*, 427 Mass. 595 (1998), the court appears to suggest that, for instance, where a person convicted almost exclusively on the basis of evidence seized pursuant to a technically defective warrant fails to raise the defect before or during trial, there is a miscarriage of justice and the defendant may have his conviction overturned at any time.

On the correct view that I have stated, there has been a miscarriage of justice after a trial in which the defendant has had a chance to make his objections, but did not, only if there is a substantial risk that an innocent person has been convicted. That is what I thought we meant in *Commonwealth* v. *Amirault*, 424 Mass. 618, 646-647 (1997), when we said that "there is a substantial risk of a miscarriage of justice if the evidence and the case as a whole . . . [leaves] us with a serious doubt that the defendant['s] guilt had been fairly adjudicated."[2] That is why we said that, "when the elements of a crime are incorrectly stated, there is a substantial risk that a person has been convicted for a course of conduct that is not criminal at all." *Id.* at 647 n.21. (As I have said, in this case and in this instance, there is no such risk.)

This conception of what constitutes a miscarriage of justice — the conviction of an innocent person — is just what the ordinary meaning of that ringing term portends. It is not a miscarriage of justice that a person reliably judged to be guilty failed to avail himself of a technicality and so allowed admission of the proof that clinches the case against him. See *Eason*, *supra* at 134 (Armstrong, J., dissenting). Few laymen would call that a miscarriage of justice. Indeed, if the term justice includes justice to the interests of society and justice to the victims of crime, the release (for in many cases that is what we would decree) of the convicted person on such a basis would itself be a grave miscarriage of justice.

And if common sense is not enough, then I note that the

[2] And lest there be a cavil about the expression "fairly adjudicated," we made it quite clear that the unobjected-to constitutional error in those cases, a violation of our State Constitution's confrontation clause, dropped out of the calculus if it had not been properly objected to at trial. *Commonwealth* v. *Amirault*, 424 Mass. 618, 651 (1997).

Supreme Court of the United States, where the stakes often are literally life or death, also defines "miscarriage of justice" in the commonsense way that I urge here: "[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence." *Sawyer* v. *Whitley*, 505 U.S. 333, 339 (1992). Accordingly, the Court has held "that the 'narrow exception' for miscarriage of justice was of no avail to the petitioner because the constitutional violation if it occurred, 'resulted in the admission at trial of truthful inculpatory evidence which did not affect the reliability of the guilt determination.' " *Id.* at 340, quoting *McCleskey* v. *Zant*, 499 U.S. 467, 502 (1991). Accord *Calderon* v. *Thompson*, 523 U.S. 538, 557-558 (1998) (reaffirming the "actual innocence" understanding of miscarriage of justice); *Schlup* v. *Delo*, 513 U.S. 298, 316 (1995) ("[w]ithout any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice . . .").

The confrontation clause violation in *Amirault* raised difficult questions as to the application of the standard I believe is the correct one, because the error went to the adjudication of guilt or innocence, and so does the error the court identifies today, although in both *Amirault* and this case, no doubt as to guilt or innocence rises to the level where we should say the standard has been met. But the broad standard the court announces today comprehends many situations in which no such question of guilt or innocence is even presented.

In *Eason, supra,* on which the court relies, the Appeals Court considered the justice of the conviction not in terms of the risk that an innocent person had been convicted — there was little or no risk of that — but whether, *without the evidence of the intercepted conversations,* the outcome would have been the same. The dissenting Justices understood that the Appeals Court was repudiating our decision in *Amirault,* see *Eason, supra* at 130 (Jacobs, J., dissenting); *id.* at 131-135 (Armstrong, J., dissenting). Today we side with the Appeals Court against ourselves. I will grant that, up until *Amirault,* the law in this regard, far from being settled, had been a nest of confusion. That is why we were at such pains to clarify it in that decision. The court today reinstates that confusion and moves in a wholly incorrect direction. The court states that it would not be appropriate to consider erroneously admitted testimony in deciding whether the error created a substantial risk of a miscarriage

of justice. In *Amirault,* we set out and adopted language from *Commonwealth* v. *Miranda,* 22 Mass. App. Ct. 10 (1986), that contradicts today's proposal. *Miranda* states that a claim of substantial risk of a miscarriage of justice "would generally not be available to a defendant prejudiced by the unobjected-to admission of highly incriminating evidence obtained in violation of Fourth Amendment protections." *Id.* at 21 n.22.

The distinction between the commonsense view of miscarriage of justice and the one the court promulgates today is of particular importance in cases involving art. 14 of the Massachusetts Declaration of Rights and the Fourth Amendment to the United States Constitution. Rarely, if ever, does a Fourth Amendment violation create the risk that an innocent person has been convicted. It is commonplace that the exclusion of evidence in these cases was instituted in *Mapp* v. *Ohio,* 367 U.S. 643 (1961), to deter police violations of privacy rights and for no other purpose.[3] That is a purpose quite avowedly extrinsic to the reliable determination of guilt or innocence, and, therefore, a defendant's failure to press it at trial does not in any way subtract from the reliability of a guilty verdict. On the contrary, in many instances it will confirm it. That is why the Supreme Court in *Stone* v. *Powell,* 428 U.S. 465 (1976), reached the more drastic conclusion that Federal postconviction relief is never to be available for Fourth Amendment violations, even in cases where the issue had been fully preserved but simply ruled on erroneously in the State courts. See Amsterdam, Search, Seizure, and Section 2255: A Comment, 112 U. Penn. L. Rev. 378 (1964).

Finally, I should say a word about ineffective assistance of counsel claims, which are the usual second string to the bow of a defendant seeking to resurrect an unpreserved claim. That standard has two prongs: First, "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, [second] if

[3]The proposition that the exclusionary rule has some other purpose under art. 14 of the Massachusetts Declaration of Rights is quite implausible, as the courts of the Commonwealth did not employ the exclusionary rule until compelled to do so by *Mapp* v. *Ohio,* 367 Mass. 643 (1961). See *Commonwealth* v. *Spofford,* 343 Mass. 703, 706 (1962); *Commonwealth* v. *Wilkins,* 243 Mass. 356, 358-362 (1923); *Commonwealth* v. *Dana,* 2 Met. 329, 337 (1841). See also Amar, The Fourth Amendment, Boston, and the Writs of Assistance, 30 Suffolk U. L. Rev. 53, 71 (1996).

that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). Both conditions must be met. If we focus only on the second prong and ignore the first, then there is a substantial risk that we shall end up once again erasing entirely the bulwark against the resurrection of unpreserved errors that was erected in *Amirault* and that the court seeks to dismantle by its unfortunate ruling about the meaning of a miscarriage of justice. It is only if we take seriously as well the first prong of the standard that this disorderly result can be avoided. "Ordinary fallible lawyers" make mistakes (that is what makes them fallible), and those mistakes will include failures to preserve claims that affect the outcome of a trial. But that must not be enough to justify a new trial. If it is, there is simply nothing left to the doctrines of waiver and finality, for every waived claim would automatically raise an ineffective assistance of counsel claim.[4]

Justice Fried participated in the deliberation on this case and authored a concurring opinion, but resigned before the opinions were issued.

---

[4]This court has, from time to time, encouraged this extreme conception of ineffective assistance of counsel by considering whether an omission by counsel was the result not of a mistake or oversight but of a tactical calculation, *as if only such a deliberate bypass could avoid turning what in hindsight appears to have been a mistake into an ineffective assistance of counsel claim.* It is important to note that there is no such stringent doctrine.