COMMONWEALTH *vs.* DEREK WRIGHT.

Essex. April 7, 2005. - July 1, 2005.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Homicide. Evidence,* Hearsay, Joint venturer, Prior consistent statement. *Practice, Criminal,* Confrontation of witnesses, Hearsay, Capital case. *Constitutional Law,* Confrontation of witnesses.

At a criminal trial, a Superior Court judge properly admitted in evidence out-of-court statements made by a codefendant based on the joint venture exception to the hearsay rule, where the statements were made in an effort to conceal the crime with which the defendant was charged as a principal and in furtherance of the cooperative effort [579-581]; further, any error arising from the prosecutor's asking a witness to comment on the truthfulness of his previous statements did not create a substantial likelihood of a miscarriage of justice that would require reversal of the defendant's convictions [581-584].

INDICTMENTS found and returned in the Superior Court Department on August 9, 2000.

The cases were tried before *Richard E. Welch, III, J.*

*Chauncey B. Wood* for the defendant.

*Marcia H. Slingerland,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. A Superior Court jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation acting as a principal and of illegal possession of a firearm.[1] On appeal, the defendant claims that admission of hearsay statements violated his constitutional right to confront and cross-examine his accusers, and that the prosecutor improperly bolstered a witness's testimony by introducing prior consistent hearsay and asking the witness to make a personal assessment of the truth of the hearsay. Because we find no merit in the defendant's claims of error and conclude there is no basis to

[1] This was the defendant's second trial. His first trial ended when the judge declared a mistrial because the jury failed to reach a verdict.

exercise our power under G. L. c. 278, § 33E, we affirm his convictions.

*Facts and procedural background.* We summarize the evidence in the light most favorable to the Commonwealth, reserving certain details for our discussion. *Commonwealth* v. *Gilbert*, 423 Mass. 863, 864 (1996), citing *Commonwealth* v. *Cordle*, 404 Mass. 733, 734 (1989), *S.C.*, 412 Mass. 172 (1992). In the late evening of June 5, 2000, the defendant, along with Eric Miller[2] and Wilson Pasteur,[3] both members of a gang called "Folk" or "Disciples" and known to wear blue, went to Lowell Street in East Lynn in search of members of a rival gang called the "Bloods."[4] The defendant, a member of the "AK's,"[5] wanted revenge for injuries he suffered in a recent attack at a 7-Eleven store by members of the "OB's."[6]

Earlier in the evening, the defendant had shown Miller a stolen .357 caliber handgun (.357)[7] that he had hidden in an abandoned car in his backyard and spoke about the possibility of getting revenge for the 7-Eleven attack. At the defendant's request, Miller had arranged for Pasteur to join them and the three spoke about "going and getting Bloods." When Pasteur questioned why they should all go if there was only one gun, the defendant said that he had another gun at a friend's house,[8] but that if they got it, they had "better do something with it."

---

[2]Miller testified for the Commonwealth in exchange for pleading guilty to manslaughter.

[3]Pasteur also was charged with murder and was tried separately. His appeal from his conviction of murder in the second degree is pending in the Appeals Court.

[4]Members of the Bloods were known to wear red.

[5]"Asian" or "Avenue" Kings, a gang whose members wear blue.

[6]A gang known as "Original Blood" that wears red. "YB's" (Young Bloods) are another Blood gang whose members also wear red. Although the AK's and YB's "get along pretty well," the AK's and OB's hate each other. Additionally, Folk and the YB's are enemies.

[7]Several days before the shooting, the defendant, Miller, and another man stole the .357 caliber handgun (.357), a .44 caliber handgun (.44), a shotgun, and two rifles from a home in New Hampshire.

[8]A couple of days before the shooting, the defendant brought a .44 handgun to his friend Voeuth Van's house and asked him to keep it for him. The handgun was a "cowboy type of gun" and had a longer barrel than the .357 handgun kept by the defendant.

On their way to retrieve the second gun, the three continued to discuss "looking for some Bloods." When the defendant retrieved the second gun from Voeuth Van,[9] he said that he was going to "take care of some fools" in East Lynn. The defendant loaded the gun, a .44 caliber handgun (.44), and handed it to Pasteur, who asked if he "just had to cock it back once and keep on shooting," to which the defendant responded, "Yeah."

With the defendant carrying the .357[10] and Pasteur carrying the .44,[11] the three men went to Lowell Street, a place where Bloods "hung out." As they walked down Lowell Street, the defendant said, "There they are right there." Without incident, the three men walked past a white car, whose occupants were members of the Young Bloods and were wearing red. When they reached the end of the street, the defendant instructed Miller and Pasteur to circle around the block and come back up Lowell Street. The defendant said he was going to "count to thirty-seven" and then start walking back toward the white car. The plan was that the defendant and Pasteur would shoot from both sides of the car to kill the Bloods inside.[12]

Pasteur and Miller circled around and starting walking up Lowell Street, but when they did not see the defendant, they continued walking past the white car. Pasteur "threw" a derogatory gang sign to the occupants of the vehicle, who responded by getting out of the car and yelling at Pasteur and Miller. While they exchanged insults, the defendant was kneeling near a white van also located on the street. At some point during the exchange, Pasteur stepped into the street and fired one shot from the .44 "straight forward"[13] at the Young Bloods, who began running. The defendant then started shooting the .357 at

---

[9]Van testified for the Commonwealth in exchange for not being charged in connection with the shooting.

[10]The .357 is a double action revolver that does not require the shooter to "cock" the hammer between shots. Rather, to fire the weapon, the shooter need only to pull the trigger.

[11]The .44 is a single action revolver, which requires the shooter to "cock" the hammer manually before pulling the trigger.

[12]Both Miller and Van testified that only the defendant and Pasteur had guns on the night of the shooting. However, the defendant's theory was that if there were two guns, Miller had one and Pasteur had one, or Pasteur had both.

[13]On June 22, 2000, an occupant of 17 Lowell Street pried out a "slug or spent round" from a pole on the porch and gave it to a Lynn police officer

the Young Bloods. He fired four or five times very quickly before running down the street and turning right. The victim was lying on the street near the van. Pasteur was still in the street "playing with the gun" when Miller yelled for him to leave. The two ran down the street and turned left.

Miller and Pasteur went to Pasteur's home, where they discussed the incident and Pasteur telephoned the defendant asking what he wanted him to do with the .44. The defendant instructed him to "hold onto it for a little while." The .44 was never recovered. The day after the shooting, the defendant enlisted Van's help in hiding the .357 at Browns Pond, where it was later retrieved.

An autopsy confirmed that the victim died from a single gunshot wound to the face. The bullet recovered from the victim's body was fired by the .357 handgun carried and hidden by the defendant.

Although the defendant neither testified at trial nor called any witnesses, his statements to police were admitted in evidence during the Commonwealth's case. In one of his statements to police, the defendant said, "I know for a fact [Pasteur] had a .44." His defense, made clear from his statements to police, through cross-examination, and from opening and closing statements, was that Pasteur fired the fatal shot and that the defendant neither had a gun nor expected that a gun would be fired. The defense focused on the fact that the only person who claimed to see the defendant shoot the victim was Miller, who agreed to plead guilty to manslaughter in exchange for his testimony.

*Discussion.* 1. *Admission of codefendant's hearsay statements.* Before the defendant's first trial, see note 1, *supra,* defense counsel filed a motion in limine requesting that the judge order the prosecutor to advise Miller that he could not answer questions based on what he was told by Pasteur. The judge allowed the motion but then ruled that if there was a good-faith basis for asking a question, "then, obviously, [the prosecutor] may ask

who was responding to a motor vehicle incident in the area. A State trooper with ballistics experience testified that the bullet was a .44 caliber spent jacketed projectile, fired from a weapon with the same firing system as the .44 stolen from New Hampshire.

the question, and . . . may solicit the response, and [the judge] will rule upon it." Defense counsel renewed each of the motions in limine before the second trial. The judge considered the motions as being refiled and stated his rulings were the same. The defendant then filed a motion in limine to preclude the prosecutor from mentioning joint venture during the opening statement because it was clear the Commonwealth's theory was that the defendant was the principal, not a joint venturer, and thus Pasteur's statements were inadmissible hearsay. The judge denied this motion and told the prosecutor, "You can definitely talk about what — you have a good faith basis to talk about the statements made by others such as Mr. Pasteur." Accordingly, at trial, Miller testified that after the shooting when they were at Pasteur's apartment, Pasteur had hidden the gun under his mattress, and called the defendant to ask what he wanted him to do with the gun. Additionally, the defendant had yet to dispose of the .357 and instructed Pasteur to "hold on" to the .44 for awhile. Moreover, Pasteur "said he only shot one shot and he showed [Miller] the empty bullet that he had. He said he only could shoot one shot because after he shot the first shot, the gun jammed. . . . He said he was trying to cock the gun back again because he thought the person that he shot was still moving." Miller further testified that "[Pasteur] didn't know for sure [whether he shot anyone], but he thought he did."

The defendant argues that admission of these statements violated his right to confront and cross-examine his accusers. We conclude there was no error.

"It is well settled that out-of-court statements by joint criminal venturers are admissible against the others if the statements are made 'both during the pendency of the cooperative effort and in furtherance of its goal.' " *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990), quoting *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976). Although this exception to the hearsay rule "does not apply [to statements made] after the criminal enterprise has ended, . . . [it] does apply where the joint venturers are acting to conceal the crime that formed the basis of the enterprise." *Commonwealth* v. *Angiulo*, 415 Mass. 502, 519 (1993), and cases cited. The defendant, however, argues that the statements were not made in an effort to conceal

the crime or in furtherance of the cooperative effort and, therefore, are not covered by the joint venturer exception to the hearsay rule. We disagree.

"A joint venturer is 'one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime.' " *Commonwealth* v. *Daughtry*, 417 Mass. 136, 138 (1994), quoting *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). Regardless of whether the defendant was the one who shot the victim, the evidence makes clear that he was in a joint venture with Miller and Pasteur, as the three agreed to look for "some Bloods" and planned to shoot them. Here, Pasteur made the statements about the gun and whether he shot the victim shortly after the shooting occurred, when he, Miller, and the defendant "were attempting actively to conceal evidence of the shooting and to avoid detection and detention." *Commonwealth* v. *Colon-Cruz, supra* at 545. At this point, no one knew who actually shot the victim, and the men were sharing information — deepening their relationship. See *Commonwealth* v. *Raposa*, 440 Mass. 684, 690 (2004). Accordingly, we conclude that there was a joint venture and the statements were made in furtherance of that venture.

The defendant further argues that the admission of Pasteur's statement violated the doctrine established in *Bruton* v. *United States*, 391 U.S. 123 (1968), and could not be cured by a jury instruction. This argument is without merit. As the judge correctly ruled that there was adequate evidence to conclude that the statements were made in furtherance of a joint venture, he properly instructed the jury that they could consider the joint venturer statements only if they had found that the Commonwealth had proved that Pasteur and the defendant were engaged in a joint venture, and that the statements were made in order to further the joint venture or to avoid detection. See *Commonwealth* v. *Clarke*, 418 Mass. 207, 219 (1994).

2. *Witness's prior consistent statement.* During cross-examination, Miller conceded that he "lied about almost everything" and did not tell "the whole truth" in his statements to the police on June 7 and 8, 2000. Defense counsel then highlighted specific lies in Miller's previous statements. At one

point, defense counsel recounted a portion of Miller's statement on June 7 and asked Miller whether it was true or false.

On redirect examination, Miller testified, "Everything wasn't true. Some of the stuff was though," with regard to his June 7 and 8 statements. The prosecutor then explored Miller's statements in detail, seeking to clarify what Miller had lied about by leading Miller through each statement paragraph by paragraph and asking him whether it was true.[14] For each paragraph, Miller testified to what was true in his statements to the police and what was false.[15]

Although he did not object to this line of questioning, the defendant now argues that by doing this the prosecutor improperly bolstered Miller's testimony by introducing prior consistent statements and by asking Miller whether those statements were true. While the defendant correctly concedes that there are instances where it is permissible to demonstrate that a witness's prior statements are consistent with trial testimony, see *Commonwealth* v. *Hoffer*, 375 Mass. 369, 375-376 (1978), he argues that a party may not elicit testimony that those prior statements are true. Because the defendant did not object to the prosecutor's questions, we review the alleged improprieties to determine whether they created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Rivera*, 430 Mass. 91, 99 (1999), citing *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998).

Generally, a witness's prior statement that is consistent with his trial testimony is inadmissible. *Commonwealth* v. *Martinez*,

---

[14]During this line of questioning, the judge instructed the jury:

"Ladies and gentlemen, you assess the credibility of each and every witness. One thing you can consider is whether they've made any prior inconsistent statements, different from what they've said on the stand. Also, the prosecutor's entitled to show that they're not inconsistent, that they are consistent. So, that's part of what you've seen here this afternoon with [defense counsel] and [the prosecutor]."

[15]Miller admitted that he was "wrong" about the defendant's putting on gloves, the color of the bandana in which the .44 was wrapped, when Miller first saw the white car, the defendant's telling Pasteur to drop off the gun in the morning, and his own involvement in stealing the guns from the house in New Hampshire.

425 Mass. 382, 396 (1997). If, however, the witness's trial testimony is impeached by a claim of recent contrivance or inducement, a prior statement made before the witness had incentive to fabricate testimony is admissible to rebut the claim of recent fabrication, but not to prove the truth of the matter. *Id.*, and cases cited. During cross-examination, the defendant was clearly trying to show that Miller's trial testimony was contrived in order to protect Pasteur and to receive a favorable disposition of his own case. However, the defendant argues that this exception does not apply because Miller had an incentive to fabricate when he spoke to the police. We reject this suggestion. At the time Miller made his statements to the police on June 7 and 8, 2000, he had not entered into any agreement with the Commonwealth. Moreover, at the time he made the statements, he did not know who had shot the victim and denied personal responsibility for the victim's death.

"The purpose of redirect examination is to explain or rebut adverse testimony or inferences developed during cross-examination." *Commonwealth* v. *Hoffer, supra* at 375, citing *Commonwealth* v. *Smith*, 329 Mass. 477, 479-481 (1952). It is well established that the prosecutor may ask a witness to explain inconsistencies between prior and present statements. *Commonwealth* v. *Dickinson*, 394 Mass. 702, 706 (1985), and cases cited. Moreover, "[t]he introduction of parts of statements on cross-examination generally allows detailed examination of the entire statements on redirect" (citation omitted). *Commonwealth* v. *Hoffer, supra* at 376 ("Where, as here, portions of prior statements are the subject of cross-examination and the prior consistent testimony sought to be introduced is itself contained in the prior statements and places the cross-examination concerning the prior statements in context, it is not error to admit the consistent testimony"). Miller's testimony that almost everything in his statement to the police was false was inaccurate. Rather, much of his June 8 version of events was reasonably consistent with his trial testimony, and it demonstrated that his trial testimony was not recently contrived.

However, "[i]t is a fundamental principle that 'a witness cannot be asked to assess the credibility of his testimony or that of other witnesses.' " *Commonwealth* v. *Triplett*, 398 Mass. 561,

567 (1986), quoting *Commonwealth* v. *Dickinson, supra* at 706. Here, unlike in the *Triplett* case where the defendant was questioned about the credibility of his mother, Miller was not asked to assess the credibility of another witness, but was asked whether portions of his own prior statements were true. Thus, the prosecutor's questions "did not create an issue of credibility between the defendant and other witnesses." *Commonwealth* v. *Alphas*, 430 Mass. 8, 18 (1999), quoting *Commonwealth* v. *Richenburg*, 401 Mass. 663, 674 (1988). Essentially, the prosecutor was asking whether the events mentioned in Miller's prior statements actually occurred, which we have previously found was not prejudicial. See *Commonwealth* v. *Alphas, supra,* quoting *Commonwealth* v. *Wright*, 411 Mass. 678, 687 (1992) ("[The prosecutor] could have asked the defendant, point by point, about the truth of each fact asserted in the statement").

While the prosecutor should not have asked Miller to comment on the truthfulness of his previous statements, this does not require reversal. We are convinced from our review of the record that the prosecutor's questioning was more likely designed to clarify Miller's testimony that he "lied about almost everything" in his previous statements to the police and to rebut the defendant's claim of recent contrivance, than to bolster Miller's testimony. See *Commonwealth* v. *Alphas, supra* at 17-20. In view of the overwhelming evidence against the defendant, and the judge's instructions to the jury,[16] we conclude that any error did not create a substantial likelihood of a miscarriage of justice.

3. *Review under G. L. c. 278, § 33E.* Pursuant to our duty under G. L. c. 278, § 33E, we have reviewed the entire record.

---

[16]The defendant himself, in his statements to police, puts the .44 in Pasteur's hands, not the .357 that fired the fatal shot. Moreover, as discussed above, there is overwhelming evidence of a joint venture — the only question that remained was whether the defendant was a principal or a joint venturer. Additionally, during the redirect examination, the judge instructed the jury that they were to assess the credibility of each witness. Similarly, in his final instructions, the judge stated that the extent to which the jury were to credit a witness's testimony was "[e]ntirely up to [them]." See *Commonwealth* v. *Dickinson*, 394 Mass. 702, 706 (1985), citing *Commonwealth* v. *Edgerly*, 13 Mass. App. Ct. 562, 574 (1982) (questions regarding truth of witnesses' testimony not prejudicial where jury instructed that they were "sole judges of the credibility of the witnesses").

As there was overwhelming evidence that the defendant was a participant in the joint venture to kill members of a rival gang regardless of whether he was the person to shoot the victim, we find no reason to exercise our power to disturb the jury's verdict, either by reducing the verdict or by granting a new trial.

*Conclusion.* Because we find no merit in the defendant's claims of error, and we decline to exercise our power under G. L. c. 278, § 33E, we affirm the defendant's convictions.

*So ordered.*