## COMMONWEALTH *vs.* PAUL J. LEAHY.

Plymouth. October 7, 2005. - December 9, 2005.

Present: MARSHALL, C.J., IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Assistance of counsel, Jury. *Waiver. Evidence,* Admissions and confessions. *Practice, Criminal,* Admissions and confessions, Voluntariness of confession, Assistance of counsel, Jury and jurors, Challenge to jurors, Voir dire, Instructions to jury, Capital case. *Jury and Jurors.*

A Superior Court judge properly denied the criminal defendant's motion to suppress his confession, where the defendant's waiver of his Miranda rights was knowingly, intelligently, and voluntarily made; where the defendant's confession was voluntary, and it was not error for police to reinstate questioning after giving the defendant time to "figure some things out"; and where the evidence in the record was not adequate to support the defendant's claim that he was deprived of his statutory right to make a telephone call pursuant to G. L. c. 276, § 33A. [484-491]

At a murder trial, the jury voir dire regarding exposure to media coverage about the crime, including the general questions asked to the entire venire and the follow-up questions asked to each individual potential juror, was adequate to protect the defendant's right to a fair trial by an impartial jury, and the judge acted well within his discretion in seating or excusing individual jurors; further, there was no support in the record that additional peremptory challenges were required in order to obtain an impartial jury. [491-499]

The judge at a murder trial acted within his discretion in refusing to reinstruct the jury completely where their request came twenty-five minutes after they retired to deliberate, and where there was no support for the contention that the request for general reinstruction was due to any confusion on the part of the jury. [499-501]

INDICTMENTS found and returned in the Superior Court Department on July 26, 2002.

The cases were tried before *Richard J. Chin,* J.

*Ruth Greenberg* for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

CORDY, J. Paul J. Leahy was convicted of the brutal stabbing

and murder of Alexandra Zapp.[1] The crime occurred shortly after 4 A.M. on July 18, 2002, in the women's bathroom of a rest area along Route 24 in Bridgewater. Leahy was arrested at the scene and later confessed. Media coverage of the crime was extensive. Some of that coverage focused on Leahy's criminal history, which was also extensive.

In his appeal Leahy contends that (1) his confession should have been suppressed because neither it nor the waiver of his Miranda rights was voluntary, police questioning was improperly reinstated after he had asserted his right to remain silent, and his statutory right to make a telephone call was not honored; (2) the judge's refusal to exclude jurors who had been exposed to any media publicity concerning his case denied him a fair trial by an impartial jury and impermissibly diminished or constrained his ability to use peremptory challenges; and (3) the judge's decision not to repeat the charge to the jury shortly after they had begun their deliberations violated his right to be tried by a jury unconfused about the law which they were to apply. We conclude that these claims have no merit. In addition, our review of the case pursuant to G. L. c. 278, § 33E, has not revealed any reason to order a new trial or reduce the jury's murder verdict.

1. *Background.* According to his confession, which was admitted in evidence, on July 17, 2002, Leahy was working the 10 P.M. to 6 A.M. shift at the Burger King restaurant adjacent to a well-known rest area on Route 24. Its public facilities are open twenty-four hours per day. Leahy saw the victim around 4 A.M., when she entered the building to use the women's bathroom. Considering whether to rob her, Leahy took out his knife and walked toward the bathroom. When the victim opened the door to leave, she came face to face with him and began to scream. Leahy forced her back into the bathroom and attempted to cover her mouth with his hand. A battle ensued, during which the victim told Leahy that she had been stabbed. The fight seemed to subside. Leahy went to the sink to wash his hands and asked the victim why she was "doing this" when all he wanted was to

---

[1]The defendant was convicted of murder in the first degree under alternative theories of felony-murder and extreme atrocity or cruelty. He was also convicted of kidnapping, armed assault with intent to rob, and armed robbery.

rob her. The victim suggested that they pretend Leahy rescued her from another assailant, but he responded that no one would believe such a story. The victim then tried to run for the bathroom door, but Leahy caught her, dragged her back to the sink area and stabbed her again. Leahy claimed that he thought he stabbed her twice more in the forearm. An autopsy revealed, however, that the victim had been stabbed and slashed twenty-six times. Any one of five of the stab wounds would have been fatal.

After stabbing her, Leahy dragged the victim into a stall, picked up her wallet from the floor, and again began to wash the blood off his hands and arms. At this point, a State police lieutenant, who had heard muffled screams and at least two thuds while in the adjacent men's room and observed drops of blood just outside the door to the women's room, opened the door. The victim's blood was visible throughout the bathroom. When the officer demanded to know what was going on, Leahy responded, "I lost it. I lost it." Leahy was taken into custody and read the Miranda warnings. Bridgewater police and emergency medical personnel arrived on the scene. After Leahy acknowledged that he understood his rights, he was asked whether he had any weapons on his person.[2] Leahy told the officers that he had a knife in his back pocket. The knife was covered with the victim's blood.

Leahy was then transported to the Middleborough State police barracks. There his bloody clothes were taken as evidence. He spent approximately two hours handcuffed to a bench in the booking room, dressed in a hospital gown, and facing large print wall posters containing Miranda warnings and information regarding an arrestee's right to make a telephone call. When a State trooper assigned to the investigation arrived at the barracks, he asked Leahy whether he had read the Miranda poster, whether he understood his rights, and whether he had been previously arrested and had those rights explained to him. Leahy answered all of these questions in the affirmative. The trooper then asked Leahy if he wanted to speak with him, to which Leahy responded, "Not right now, in a minute. I need to figure

---

[2] Leahy was, in fact, read the Miranda warnings by two different officers at the scene. In both instances, he indicated that he understood those rights.

some things out." The trooper noticed that Leahy had some cuts and scratches on his hands and the left side of his face and neck, and proceeded to prepare a report of these observations.

Approximately twenty minutes later the trooper approached Leahy and again said that "when you need to figure things out, it's good to talk to somebody else about them." Leahy agreed to talk to the officer, at which point he was uncuffed from the bench and brought to a conference room. Leahy was shown and read a State police Miranda waiver form and an arraignment waiver form. After indicating that he understood the rights described on the forms (including his right to make a telephone call) and after signing them, Leahy gave a statement confessing to having stabbed and robbed the victim. When Leahy finished his statement, crime scene investigators took swabs from his hands and the police summoned medical personnel to treat his cuts, which were open but not then bleeding.

Leahy's defense at trial was not identity, but that the Commonwealth's evidence was inadequate to establish that the killing was premeditated or that robbery (the predicate offense for felony-murder) was intended.

2. *Motion to suppress.* Leahy filed a motion to suppress his confession, alleging that he was questioned without being advised of his Miranda rights; that any waiver of those rights was not made knowingly, intelligently, and voluntarily; that his confession was not voluntary; and that the questioning violated his right to a prompt arraignment and his statutory right to a telephone call. Leahy's affidavit, filed in support of the motion, simply described the injuries to his hands, the fact that he was handcuffed in the middle of a police station, and his purported hope at the time that he would receive medical help for his pain after talking with the police. His memorandum focused solely on the voluntariness of his Miranda waiver and his confession. At the suppression hearing Leahy principally argued that the waiver of his Miranda rights was not voluntary. The motion judge (who was also the trial judge) made findings of fact and rulings of law and denied Leahy's motion. The judge concluded that both Leahy's Miranda waiver and his confession were voluntary. There was no error.

The Commonwealth bears the burden of establishing that a

defendant's right to remain silent was " 'voluntarily, knowingly and intelligently' waived." *Commonwealth* v. *Hooks*, 375 Mass. 284, 288 (1978), quoting *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966). See *Commonwealth* v. *Edwards*, 420 Mass. 666, 669-670 (1995). In reviewing the denial of a motion to suppress, we independently apply constitutional principles to the facts, but defer to the motion judge's findings of fact unless they are clearly erroneous. *Commonwealth* v. *Sicari*, 434 Mass. 732, 746-747 (2001).

The judge found that Leahy had been fully informed of his Miranda rights on four occasions, that he understood those rights, and that he voluntarily signed the Miranda and prompt arraignment waiver forms. *Commonwealth* v. *Magee*, 423 Mass. 381, 387 n.8 (1996) (signed waiver form on its own constitutes some evidence of voluntariness but is not dispositive). The judge also found that the State police did not condition summoning medical attention for Leahy's injuries on his waiving of rights or agreeing to make an incriminating statement. To the contrary, he noted that it was the police officer who noticed Leahy's injuries (and eventually called for medical attention), that Leahy did not complain of pain or ask for medical assistance for those injuries, and that the injuries consisted merely of cuts on Leahy's fingers and scratches on his neck.[3] The judge further found that Leahy did not suffer emotional trauma due to his being handcuffed in the booking area and clothed in a hospital gown. Rather, the judge found that Leahy had no difficulty understanding or responding appropriately to police inquiries.[4] The judge's factual findings are fully supported by the record, and amply support his conclusion that Leahy's waivers were knowingly, intelligently, and voluntarily made.

Leahy averred, however, that the trooper's suggestion that

---

[3] The testimony at the hearing on the motion to suppress was that the injuries did not appear to be serious and were treated solely by wiping the cuts with alcohol and applying a few bandages. Photographs of Leahy's hands and neck, admitted in evidence at the hearing, were consistent with this testimony.

[4] To the extent that Leahy argues that his release from being handcuffed to the bench was conditioned on his agreement to speak to the police, there was no evidence to support that claim. At the motion hearing, the officer testified that Leahy was to be released from handcuffs, booked, and moved to a cell once he decided whether or not he wished to give a statement.

sometimes it helps to speak with someone if you want to get things straightened out was a false promise of police aid that overrode his ability voluntarily to waive his rights. See *Commonwealth* v. *Edwards, supra* at 671 (obtaining waiver by false statements is "disapproved of and may indicate that any subsequent waiver was made involuntarily"). The judge rejected this claim, and on the record before us, the argument falls far short. The statements made by the trooper were well within boundaries we have previously held to be acceptable. See *Commonwealth* v. *Scoggins*, 439 Mass. 571, 577 (2003) (rejecting claim that false promises overbore defendant's free will based in part on fact that "officers stopped short of making an assurance that the defendant would benefit from admitting his guilt"); *Commonwealth* v. *Meehan*, 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980) (while "officer may suggest broadly that it would be 'better' for a suspect to tell the truth . . . or may state in general terms" such benefits, "[w]hat is prohibited . . . is an assurance, express or implied, that [a confession] will aid the defense or result in a lesser sentence"); *Commonwealth* v. *Felice*, 44 Mass. App. Ct. 709, 713-714 (1998) ("While we have little doubt that the [the officer's] repeated assurances of help and sympathetic words helped the defendant to unburden himself, we do not believe that the statement was involuntary. The defendant was given Miranda warnings and . . . knew . . . that if he confessed he would be prosecuted. At no time did [the officer] indicate that the defendant would not be prosecuted and would not go to jail"). Accord *Bryant* v. *Vose*, 785 F.2d 364, 367-368 (1st Cir.), cert. denied, 477 U.S. 907 (1986) (rejecting similar voluntariness claim because there was "no evidence . . . of any promise by the [police] Chief" and emphasizing that "[a]ny indirect promise to be inferred from the . . . remark is so slight as to be insignificant . . .").[5]

Due process requires a separate inquiry into the voluntariness

[5]The test for determining whether a waiver was voluntary "is essentially the same as that used for determining the voluntariness of statements under the due process clause." *Commonwealth* v. *Edwards*, 420 Mass. 666, 670 (1995). Accordingly, our decisions regarding the consequences of police actions on a defendant's ability voluntarily to make a statement are persuasive authority as to how such police actions would affect the voluntariness of a

of a statement, apart from the Miranda waiver. *Commonwealth* v. *Magee, supra* at 387-388. In making this determination, "we look at the totality of the circumstances . . . 'to ensure that the defendant's confession was a free and voluntary act and was not the product of inquisitorial activity which had overborne [his] will.' " *Id.*, quoting *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976). The judge's findings as to the circumstances surrounding Leahy's arrest, waiver, and confession, and our own review of the record, support the conclusion that Leahy's confession was voluntary.

For the first time on appeal, Leahy contends that the State trooper did not "scrupulously honor[]" his decision to terminate questioning when he reinitiated it after Leahy stated that he did not want to speak "now," needed "to figure some things out," and would speak "in a minute." See *Michigan* v. *Mosley*, 423 U.S. 96, 103-104 (1975) ("Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation"); *Commonwealth* v. *Taylor*, 374 Mass. 426, 431-433 (1978), quoting *Michigan* v. *Mosley, supra* at 104 ("*Miranda* mandated that the admissibility of any statements obtained after the person in custody has decided to remain silent depended on whether the person's ' "right to cut off questioning" was "scrupulously honored" ' "). As an initial matter, this argument is waived, and we therefore review it pursuant to G. L. c. 278, § 33E, only to determine whether, if there was error, such error created a substantial likelihood of a miscarriage of justice.[6] *Commonwealth* v. *Bly*, 444 Mass. 640, 648-651 (2005).

---

defendant's Miranda waiver.

[6]Nothing in Leahy's motion to suppress, his affidavit, or the supporting memorandum contends that his rights were violated by the police reinitiating questioning after he sought to terminate it by asserting his right to remain silent. At the motion hearing, what Leahy intended by his statement that he needed a "minute" to figure things out before speaking to the police came up only in the context of the voluntariness of his Miranda waiver. In response to a suggestion by the judge that Leahy's request for "a minute" before speaking amounted to a refusal to be interrogated, defense counsel merely said, "So, I don't know — I would suggest that it's a refusal for that time. There's an issue, then, whether or not it invites another attempt or indicates that he's mulling it over." Counsel then argued that the police improperly took advantage of

The limitations set forth in *Michigan* v. *Mosley, supra,* regarding the reinitiation of questioning after a suspect has asserted his right to remain silent do not apply unless a "defendant's invocation of the right to remain silent [is] clear and unequivocal."[7] *Commonwealth* v. *Almonte,* 444 Mass. 511, 519 (2005). See *Commonwealth* v. *Sicari,* 434 Mass. 732, 745-746 (2001), quoting *Commonwealth* v. *Selby,* 420 Mass. 656, 662 (1995) (after waiver of Miranda rights, defendant must show "expressed unwillingness" to continue interrogation to reassert those rights). Whether invocation of the right is clear and unequivocal is to be determined by the totality of the circumstances. See *Commonwealth* v. *Almonte, supra.*

In the instant case, Leahy had been informed of his Miranda rights twice at the scene and twice acknowledged that he understood them. After being so advised, he told the arresting officer that he was carrying a knife. He thus waived his right to remain silent. Later, at the barracks, when the investigating officer arrived and asked Leahy if he wanted to speak, he replied, "Not right now, in a minute. I need to figure some things out." This response was not an unequivocal assertion of his right to

this indecision by suggesting that it would help Leahy to talk it over with them.

[7]In *Michigan* v. *Mosley,* 423 U.S. 96, 97 (1975), a defendant arrested in connection with several robberies was read the Miranda warnings, stated that he did not want to answer "any questions about the robberies," and was taken to a cell. *Id.* Two hours later, the police once again read the defendant the Miranda warnings, but now questioned him about a homicide unrelated to the robberies. See *id.* at 98, 104. In this second interrogation, the defendant made an incriminatory statement in connection with the homicide, which he later attempted to suppress. *Id.* at 98-99. Interpreting its holding in *Miranda* v. *Arizona,* 384 U.S. 436, 473-474 (1966) ("If the individual indicates in any manner . . . that he wishes to remain silent, the interrogation must cease"), the Supreme Court determined that law enforcement officers were required scrupulously to honor a defendant's right to cut off questioning. See *Michigan* v. *Mosley, supra* at 100-101. The *Mosley* Court then concluded that reinitiating questioning on a different topic did not violate this standard in the case before the Court because Mosley merely asked not to be questioned about a specific subject (the robberies). *Id.* at 105-106. The *Mosley* Court thus distinguished that case from cases where the police refuse "to discontinue the interrogation upon request" or make "repeated efforts to wear down [an arrestee's] resistance and make him change his mind." See *id.* The Court found it important that the police immediately cut off questioning for a significant period of time when Mosley first stated his desire not to answer any questions relating to the robberies. See *id.* at 106-107.

remain silent. It was fairly understood to be an indication that Leahy wanted to collect his thoughts before deciding whether to begin answering further questions concerning the crime. Cf. *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 386 (1984) (defendant's confession given both before and after short break showed that defendant's request, "Can we stop please?" was only request for break and did not indicate expressed unwillingness to continue interrogation). It is not a clear expression of "an unwillingness to speak." *Commonwealth* v. *Selby, supra* at 661-662. It therefore was not error for the police to reinitiate the conversation after giving Leahy what he asked for, time to "figure some things out."

Finally, Leahy asserts that his confession should be suppressed because he was not informed of his right to make a telephone call until after he agreed to speak to the investigating officer. General Laws c. 276, § 33A, provides in relevant part:

> "The police official in charge of the . . . place of detention . . . shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such . . . place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter."

Although the statute provides no remedy for a violation, this court has "grafted an exclusionary rule to it . . . [i]f intentional police misconduct deprives a defendant of the statutory right" (citations omitted). *Commonwealth* v. *Alicea*, 428 Mass. 711, 716 (1999).

The defendant bears the burden of establishing an intentional violation of the statute. See *Commonwealth* v. *Scoggins*, 439 Mass. 571, 578 (2003). The evidence in the record is inadequate to support Leahy's claim either that such a deprivation occurred, or, if it did, that it was intentional. Leahy's affidavit is silent as to whether or when he was informed of or deprived of his right to use the telephone. Although Leahy asserts that the testimony at the suppression hearing demonstrates that he was informed of his right to make a telephone call only after he

agreed to give a statement, that testimony is decidedly inconclusive.[8] Defense counsel did not press this claim in his closing argument at the suppression hearing.

Assuming there was evidence of a violation of the statutory right, nothing in the evidence supports a conclusion that it was intentional. See *Commonwealth* v. *Painten*, 429 Mass. 536, 542 (1999) ("suppression of evidence obtained as a result of an unintentional deprivation of a defendant's right to make a telephone call is not required"). After he was brought to the barracks, Leahy was seated in the booking area across from an easy-to-see, large poster informing arrestees of their right to make a telephone call. Leahy also told the investigating officer that he knew his rights and had been arrested before. In these circumstances, it was reasonable for the officer to assume that Leahy was well aware of his right to make a telephone call. See *Commonwealth* v. *Rodriguez*, 58 Mass. App. Ct. 610, 622 (2003) (given prior experience with criminal justice system, together with information given him that he could consult lawyer at any time, defendant knew he had access to telephone should he desire to use it).

Additionally, there is no evidence that this alleged violation was part of an effort to encourage Leahy to incriminate himself. Indeed, before the start of substantive questioning, the trooper thoroughly reviewed with Leahy his Miranda, telephone, and arraignment rights as set out in the State police waiver forms. If the police had intended to deprive Leahy of his right to make a telephone call in order to secure his statement, it would have made little sense to inform him of that right prior to obtaining such a statement. Where delay "was not designed to gain inculpatory information" and the "defendant was not questioned during [the delay] but simply made to wait for the officers' arrival," this court has concluded such delay to be unintentional. *Commonwealth* v. *Johnson*, 422 Mass. 420, 429 (1996) (upholding refusal to suppress statement made after being handcuffed

---

[8]When asked whether the defendant had been allowed to make a telephone call prior to the time the State trooper first saw him (two hours after Leahy had been taken to the booking room at the State police barracks), the trooper answered, "I do not believe. I don't know. I don't know if he was allowed to use the phone . . . ." Later at the hearing, similar colloquies ensued, which were also not dispositive of the issue.

to wall of police station for two hours without being advised of right to make telephone call). See *Commonwealth* v. *Bouchard*, 347 Mass. 418, 420-421 (1964). The motion to suppress Leahy's confession on this ground was properly denied.

3. *Jury empanelment.* The trial began on September 22, 2003, in the Superior Court in Plymouth County sitting at Brockton. In the fourteen months between the murder and trial, media coverage had been extensive. Prior to the start of jury selection, Leahy moved to exclude for cause any potential juror who had been exposed to any of that coverage and for the award of additional peremptory challenges. In support of these motions, Leahy provided the judge with approximately seventy-five articles (including front page articles in The Boston Globe, The Boston Herald, The Brockton Enterprise, and The Patriot Ledger) and a number of television news stories that reported on the murder. The vast majority of these articles were published either in July of 2002 (immediately following the murder) or in August of 2003 (in anticipation of the trial). Most of the articles contained information regarding Leahy's criminal history (rape, assault and battery, breaking and entering, malicious destruction, etc.). Some described him as a repeat rapist or a registered sex offender. For example, on the first day of jury selection, the Metro section of The Boston Globe contained an article concerning this case entitled "Convicted Sex Offender Goes to Trial." The Boston Herald and The Brockton Enterprise similarly published articles at the start of the trial referencing Leahy's prior problems with the law. The motions were denied.[9]

Leahy also sought individual voir dire of potential jurors. This motion was allowed. The judge first asked the potential jurors as a group the questions required by G. L. c. 234, § 28,[10] and then, individually, questioned them regarding their responses

---

[9]In denying Leahy's motion for additional peremptory challenges, the judge stated that after individual voir dire obtained indifferent jurors, additional challenges would not be necessary.

[10]General Laws c. 234, § 28, requires that the "Court shall . . . examine . . . a person . . . called as a juror . . . to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice . . . . In a criminal case such examination shall include questions designed to learn whether such juror understands that a defendant is presumed innocent until proven guilty, that the commonwealth has the burden of proving guilt beyond a reasonable doubt,

to those questions and other relevant matters. Counsel were permitted to request additional questions during the individual voir dire examinations.

In support of his motion to exclude jurors who had been exposed to media coverage, defense counsel had emphasized that many of the news stories contained references to Leahy's criminal background, that this information was both extraneous and highly prejudicial, and that exposure to it would make it impossible for a potential juror to be impartial. Accordingly, the judge directed his questions during individual voir dire to sorting out juror exposure to general information about the crime (to which they would be exposed during the trial) from exposure to information about the defendant himself. The judge excluded for cause any member of the jury venire who had been exposed to information regarding Leahy's prior criminal history regardless whether they claimed they could be impartial.[11] He also excluded those jurors about whom there was a serious question regarding their ability to be impartial for any reason including exposure to general information about the crime.

During the empanelment Leahy used all of his peremptory challenges to strike persons exposed to media coverage about the crime who had not been removed for cause. At the conclusion of the process, jurors remained seated who had some exposure to that coverage.[12] Defense counsel renewed his motion that all jurors exposed to any media coverage should be excused for cause and explained that he had used all of his peremptory challenges to strike such jurors. Leahy contends that the judge's rulings violated his Federal and State constitutional right to an impartial jury. *Commonwealth* v. *Seabrooks*, 433 Mass. 439, 442 (2001) ("Article 12 [of the Massachusetts Declaration of Rights] and the Sixth Amendment [to the United States Constitution] guarantee a criminal defendant the right to

---

and that the defendant need not present evidence in his behalf."

[11]For example, one juror was excused, without regard to his assertion that he could be impartial, after he acknowledged that he knew about the defendant "just what I read in the papers about him being previously released or something like that from prior incarcerations." Another juror was excused when she told the judge of a radio broadcast she heard that morning that "mentioned that he has priors."

[12]The defendant explicitly references juror 12-5 in his brief.

a trial before an impartial jury"); *Commonwealth* v. *Susi,* 394 Mass. 784, 786 (1985). See *Irvin* v. *Dowd,* 366 U.S. 717, 722 (1961) ("In essence, the right to jury trial guarantees . . . a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process").

Relying principally on *Irvin* v. *Dowd, supra,* Leahy argues that the judge incorrectly denied his request to exclude for cause all potential jurors who were exposed to any media publicity concerning the instant case. In that case, the United States Supreme Court concluded that a defendant had been denied a fair jury trial by impartial jurors because sensational media reports concerning six related murders, his confession to those murders, and his criminal background had been so pervasive in a small, rural Indiana community that juror impartiality was impossible. See *id.* at 725-726 ("the build-up of prejudice [was] clear and convincing"). Such extensive publicity overrode the credit usually given to a juror's assertion of impartially. See *id.* at 727-728 (noting that "statement[s] of impartiality can be given little weight" where adverse publicity was so widespread that almost entire jury venire "admitted prejudice").

The Supreme Court, however, has largely limited the holding in *Irvin* v. *Dowd, supra,* to its facts and rejected its application where there is no indication that the pretrial publicity was so pervasive or had such effect, e.g., *Murphy* v. *Florida,* 421 U.S. 794, 798 (1975) (*Irvin* case involved trial in rural community that had been "utterly corrupted by press coverage"). For example, in *Mu'min* v. *Virginia,* 500 U.S. 415, 428-429 (1991), which involved a murder in Prince William County that received substantial news coverage, the Supreme Court declined to follow the *Irvin* case because "the kind of community in which the [media] coverage took place and [the] extent of media coverage" was sufficiently different from the type at issue in the *Irvin* case. See *id.* at 429 ("Unlike [that] community . . . Prince William [County] [] had a population . . . of 182,537 . . . . It is a part of the . . . Washington statistical area . . . in which, unfortunately, hundreds of murders are committed each year").

Similarly, Plymouth County, as part of metropolitan Boston, is a far cry from a small rural community in Indiana. Its popula-

tion and urbanity greatly decrease the risk that an impartial jury could not be seated. In addition, the publicity surrounding the present murder, though substantial, was not all consuming and constant. Contrast *Irvin* v. *Dowd, supra* at 725 (noting articles unleashed against defendant "during the six or seven months preceding his trial").

The circumstances created by the intensity of the publicity reported in *Irwin* v. *Dowd, supra* at 727, were extraordinary indeed: ninety per cent of the jury venire had a preconceived notion of the defendant's guilt; two out of three jurors not excluded for cause had the same preconception. In contrast, most of the potential jurors in this case indicated that they had not formed any opinion about Leahy's guilt; and each of the jurors not excused for cause denied having any preconceived notions about it. Unlike the *Irvin* Court, we have no reason to assume that those who expressed impartiality were lying or mistaken about their own ability to judge fairly. See *Murphy* v. *Florida, supra* at 802-303 (explaining that excusing twenty jurors out of seventy-eight person venire for cause "by no means suggests a community with sentiment so poisoned against [the defendant] as to impeach the indifference of jurors who displayed no animus of their own"); *Commonwealth* v. *Clark,* 432 Mass. 1, 6 (2000) (argument that where more than one-third of jury venire had been prejudiced it was impossible to empanel impartial jury has no merit); *Commonwealth* v. *Angiulo,* 415 Mass. 502, 515-516 (1993) (fact that forty-two per cent of jury were excused because they had "knowledge" of defendant fell short of showing that "it was practically impossible to empanel an impartial jury" or that prejudice with respect to jurors, who claimed to be impartial, should be presumed).

To the extent that *Irvin* v. *Dowd, supra,* and its progeny set forth any bright line rule, it is that jurors' assertions of impartiality should be accepted by the judge unless extraordinary circumstances give some reason to question such assertions. "It is not required . . . that the jurors be totally ignorant of the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 722-723. See *Murphy* v. *Florida, supra* at 799 (Court's decisions should not be

"made to stand for the proposition that juror exposure to information about a . . . defendant's prior convictions or . . . news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process"). No extraordinary circumstances were present here.

The judge was only required to "determine whether jurors [could] set aside their own opinions, weigh the evidence (excluding matters not properly before them), and follow the instructions of the judge." *Commonwealth* v. *Stroyny*, 435 Mass. 635, 639 (2002). Reviewing the jury voir dire as a whole, including the general questions asked to the entire jury venire and the follow-up questions asked to each individual potential juror, we conclude that the voir dire was adequate and the judge acted well within his discretion in seating or excusing the jurors that he did. See *id.* ("Whether to accept the declaration of a juror that he or she is disinterested lies within the broad discretion of the trial judge").

One of the questions required by G. L. c. 234, § 28, and asked by the judge was: "Do any of you know of any reason why you would not be impartial in this case and be able to render a true and just verdict based solely on the evidence and the law?" When questioning jurors individually, the judge first asked whether a juror had any affirmative responses to the questions he had addressed to the venire. The judge could properly credit a juror's negative response to this question as an assertion of impartiality. If, during the voir dire, a juror acknowledged knowing something about the case (other than about the defendant's background, which operated as an immediate disqualification), the judge usually asked that juror again whether he or she could impartially decide the case based on only the facts adduced in the court room. The judge conscientiously distinguished between persons that he believed could be impartial despite exposure to media coverage and persons that he did not believe could be impartial.[13]

Leahy specifically takes issue with the empanelment of juror

---

[13]For example, the judge included a juror who replied, "I think. I've never done this before so it's hard"; excluded a juror who replied, "I'm not sure"; included a juror who replied, "I think I could"; excluded a juror who replied, "I don't think so"; included a juror who replied, "I suppose so"; and excluded

12-5, who ultimately remained on the jury. In his brief, Leahy professes to transcribe the voir dire of juror 12-5[14] and objects to the fact that the judge did not ask whether the juror could be impartial in light of the fact that she had heard the defendant was "caught." Leahy overlooks, however, the opening question asked by the judge and the juror's response (THE JUDGE: "Did you have any affirmative responses to the questions I just asked?" THE JUROR: "No"). As we have already said, the judge is entitled to credit this assertion of impartiality. That the juror knew that the defendant was caught in the act — a fact that was not going to be contested at trial — did nothing to call into question the juror's original assertion of impartiality. As such, once the judge ensured that juror 12-5 did not know anything prejudicial about the defendant, he properly did not excuse her. There was no error.[15]

Leahy also argues that the judge's wrongful refusal to exclude potential jurors for cause forced him unnecessarily to expend his peremptory challenges on those jurors, denying him the ability to use the peremptory challenges for other purposes. "[T]he erroneous denial of the right to exercise a proper peremptory challenge is reversible error without a showing of prejudice," *Commonwealth* v. *Wood*, 389 Mass. 552, 564 (1983), if a defendant has "adequately shown that he would have exercised a proper peremptory challenge, had another been available, to exclude at least one of the sitting jurors." *Com-*

---

a juror who replied, "I really read a lot of the publicity around this case. I don't know if I could be impartial." Clearly, the judge was engaging in credibility determinations, determinations that we would not revisit absent a compelling reason.

[14]THE JUDGE: "Do you know anything about the facts of this case?"

THE JUROR: "No, just television."

THE JUDGE: "What do you know about the case from watching television?"

THE JUROR: "I thought he was caught. While he did the crime, I thought he was caught."

THE JUDGE: "Do you know anything about the defendant's background?"

THE JUROR: "No, oh, just that he worked at the store."

THE JUDGE: "Okay. Thank you. I'll ask you to remain."

[15]Leahy did not individually challenge juror 12-5 for cause, request that the judge make further inquiry of the juror, or use one of his peremptory challenges to remove the juror, even though he had them to use when juror 12-5 was seated.

*monwealth* v. *Auguste*, 414 Mass. 51, 58 (1992). We will reverse where a "judge refuses to excuse any juror who should be excused for cause, and as a result the defendant exhausts all peremptory challenges and is forced to accept a juror whom he otherwise would properly have challenged." *Commonwealth* v. *Seabrooks*, 433 Mass. 439, 445 (2001).

Leahy did not use his last peremptory challenge until the final seat on the jury was being filled, and made no showing that he was thereby forced to accept a juror he would have peremptorily challenged. Even if he had, we would not conclude that the judge committed reversible error, because the judge did not abuse his discretion in refusing to exclude for cause any of the jurors on whom Leahy exercised his peremptory challenges. See *id.* at 445 (rejecting claim of diminution of peremptory challenges where judge did not wrongfully refuse to excuse for cause any of fourteen jurors peremptorily challenged by defendant). The mere exposure to general media regarding this case did not require a juror to be excused for cause. Leahy, however, specifically points to four jurors that he peremptorily challenged who he contends, nonetheless, should have been excluded for cause. We address each of these jurors in turn.

The alleged error in the seating of one juror arises from his answer to the judge's question whether he could be impartial even though he had heard media reports that Leahy had followed a woman into a restroom and strangled her. His answer was, "I think I could."[16] There are a number of ways that the phrase, "I think I could," might be interpreted. It would be entirely reasonable to conclude that this statement professed an ability to be impartial. Such a determination, in any event, turns on credibility and is the province of the trial judge, *Commonwealth* v. *Sleeper*, 435 Mass. 581, 587 (2002), who clearly found so. The other three potential jurors about whom Leahy now complains all asserted that they could be impartial, by answering the judge's general or individual questions on the subject. Leahy argues, however, that these assertions of impartiality should be discounted because each potential juror

---

[16]While Leahy's brief states that the juror's response was, "I think so," the transcript shows that the actual response was, "I think I could." The judge had no problem excusing a juror who had responded, "I don't think so."

expressed knowledge of what occurred at the Burger King that showed some preformed opinion of the case. See *Commonwealth* v. *Sinnott*, 399 Mass. 863, 883 (1987), quoting *Irvin* v. *Dowd*, 366 U.S. 717, 722 n.3 (1961) ("judges must discount jurors' claims of impartiality where jurors also admit, contrarily, to 'those strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them; which will combat that testimony and resist its force' "). One of these jurors stated that he knew "what went down at the Burger King." Another opined that "basically it was a horrible crime." And a third admitted knowing "where [it] happened, what he did."

The contested facts of this case did not concern the identity of the killer,[17] but whether the killing satisfied the elemental requirements for murder in the first degree. While preconceived notions of "what went down" or that the crime was "horrible" might, for example, bear on whether the killing was committed with extreme atrocity or cruelty, it was not unreasonable for the judge to determine that these jurors did not have such "strong" and "deep impressions" on the subject that they could not put them aside and impartially weigh the evidence introduced at trial. See *Commonwealth* v. *Sinnott, supra* at 883, 884 (leaving determinations to sound discretion of trial judge). Here, the judge could have understood an acknowledgment of knowing "what went down at the Burger King" to mean mere knowledge of the fact that a fatal stabbing had taken place there. Additionally, it was clear that this potential juror could not recall things that he may have read because his exposure to the news reports was far in the past. As for the potential juror who knew "where [it] happened, what he did," the juror also explained, "I really don't know too much about the case. I haven't heard much . . . ." And although the potential juror who expressed an

---

[17]In his brief, Leahy argues for the first time that we should consider juror impartiality as to the identity of the killer. He contends that had a jury without any media exposure been empanelled, he could have defended the case on the basis that it was the State police lieutenant, who burst in and arrested him next to the body of the victim while in possession of the murder weapon and her wallet, and not he, who committed the murder. We reject this argument. Leaving aside the problem of this contention in light of Leahy's confession, if Leahy wished to argue identity, he was free to do so. He did not.

opinion that this was "a horrible crime" presents a closer case, we cannot say that this opinion amounted to solid evidence of a distinct bias. See *United States* v. *Angiulo*, 897 F.2d 1169, 1183 (1st Cir. 1990) (requiring "solid evidence of distinct bias" to force judge to disregard jurors' assertion of impartiality). In such circumstances, we defer to the judge, who benefits from the live testimony of the juror. Accord *Patton* v. *Yount*, 467 U.S. 1025, 1031 (1984), quoting *Irvin* v. *Dowd*, *supra* at 723 (trial judge's finding of juror impartiality may "be overturned only for 'manifest error' ").

With respect to Leahy's contention that the judge erred by not awarding him additional peremptory challenges, "there is no support in this record that additional challenges were required in order to obtain an impartial jury." *Commonwealth* v. *Lattimore*, 396 Mass. 446, 450 (1985); *Commonwealth* v. *Burden*, 15 Mass. App. Ct. 666, 674-675 (1983) (rejecting similar claim because "defendant made no showing to the trial judge, or to us on appeal, that he needed additional peremptory challenges in order to obtain an impartial jury"). Leahy did not request additional peremptory challenges after he used all of those made available to him. He does not claim (and could not claim) that the only juror seated after his last peremptory challenge was exercised had any exposure to prejudicial media coverage; neither does he contend that he would have used a peremptory challenge to strike the juror if he had one remaining. There was no error.

4. *Refusal to reinstruct the jury.* Leahy does not claim any error in the judge's comprehensive and meticulous jury instructions, and we perceive none. Rather, Leahy suggests that the judge should have honored the jury's request for complete reinstruction, and having failed to do so, permitted unconstitutional juror confusion as to the law governing the case to deprive him of due process under the Fourteenth Amendment to the United States Constitution and a fair trial under the Sixth Amendment. It has long been our rule that the "necessity, extent, and character of supplemental instructions in response to a jury request are matters within a trial judge's discretion." *Commonwealth* v. *O'Connor*, 407 Mass. 663, 667 (1990), citing *Commonwealth* v. *King*, 366 Mass. 6, 10 (1974), cert. denied

sub nom. *McAlister* v. *Massachusetts*, 419 U.S. 1115 (1975). A judge is not automatically "required to repeat the whole or any part of his original instructions" to the jury. *Commonwealth* v. *King*, *supra* at 11. We thus review the judge's decision not to reinstruct the jury for abuse of discretion. "In order to find an abuse of discretion, it is necessary to decide that no conscientious judge, acting intelligently, could honestly have taken the view expressed . . . ." *Commonwealth* v. *Lyons*, 444 Mass. 289, 298 (2005), quoting *Commonwealth* v. *Jaime*, 433 Mass. 575, 579 (2001).

We are satisfied that the judge acted within his discretion in refusing to reinstruct the jury completely where their request came twenty-five minutes after they retired to deliberate. It was wholly reasonable for the judge to assume that requiring the jurors to deliberate further would either resolve their need for any reinstruction or would focus their request on areas of true confusion. In fact, this is precisely what occurred. One hour after resuming their deliberation, the jury requested instruction whether, if they convicted Leahy on one theory of murder in the first degree, they needed to determine whether he was guilty under the other theories of murder in the first degree. The judge responded to this request, and also reinstructed them regarding the need for unanimity in their verdict. The jury obviously understood that the judge's refusal of their first request for general reinstruction was not intended to discourage them from asking further clarifying questions ("The court will not reinstruct you *at this time*" [emphasis added]).

Moreover, there is no support for the contention that the request for general reinstruction was due to any confusion on the part of the jury. The court officer who transmitted the note to the judge stated that one juror requested reinstruction, but never explained why. Confusion cannot be simply inferred from a reinstruction request. "It is not uncommon for jurors to request reinstruction, not because they are confused, but because they are proceeding conscientiously with deliberations and want to be reminded of an instruction." *Commonwealth* v. *Thomas*, 439 Mass. 362, 369 (2003). The cases Leahy relies on stand for the proposition that judges must address expressed juror confusion and are thus distinguishable. See, e.g., *People* v. *Nilsson*, 230

Ill. App. 3d 1051, 1059 (1992) ("it is not only the right but the duty of the court to reinstruct on any question of law . . . *on which the jury say they are in doubt* and on which they ask further instruction" [emphasis added]). See also *Commonwealth* v. *Thomas*, 21 Mass. App. Ct. 183, 186 (1985), quoting *Bollenbach* v. *United States*, 326 U.S. 607, 612-613 (1946) ("When a jury makes explicit its difficulties, a trial judge should clear them away with concrete accuracy"). There was no error.

5. *General Laws c. 278, § 33E.* Because the defendant was tried and convicted on a charge of murder in the first degree, we review the whole case broadly to decide whether, for any reason, justice may require either a new trial or a verdict of murder in the second degree or manslaughter. G. L. c. 278, § 33E. "The search under § 33E is a more general and an obligatory one for a result that may be 'more consonant with justice,' " *Commonwealth* v. *Davis*, 380 Mass. 1, 15 n.20 (1980), quoting *Commonwealth* v. *Seit*, 373 Mass. 83, 94 (1977), but "[w]e do not sit as a second jury to pass anew on the question of the defendant's guilt." *Commonwealth* v. *Reddick*, 372 Mass. 460, 464 (1977). This was a brutal crime inflicted on an innocent young woman with no mitigating circumstances, and the defendant was convicted after a fair trial. We perceive no reason to modify or to set aside the jury's murder verdict.

*Judgments affirmed.*