NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-653

COMMONWEALTH

vs.

RADOSLAW CZERKAWSKI.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant was convicted of twelve counts of animal cruelty following a jury trial.[1] Prior to trial, the defendant moved for a change of venue due to what he claimed was substantial pretrial publicity that interfered with his right to a fair and impartial jury. This motion was denied. The defendant renewed the motion for a change of venue before a second judge, and it was denied again.[2] After conviction, the defendant noticed an appeal, which we stayed to allow him to file a motion for a new trial. That motion was denied, and the

---

[1] The defendant was found not guilty on a single count of misleading police.

[2] Neither motion judge was the trial judge.

defendant filed a second notice of appeal.  In this consolidated appeal, the defendant argues that the pretrial publicity was so substantial as to require a change of venue due to impairment of the local jury pool.  We affirm.

1.  Background.  a.  Facts.  Viewing the evidence in the light most favorable to the Commonwealth, the jury could have found the following facts.  In January 2013, the defendant, Radoslaw Czerkawski, began working as a caregiver for Janina Stock, who was ninety-four years old at the time, after having been hired by her grandchildren.  The defendant worked in that position, living with Stock in her home in Quincy, until Stock died on the morning of August 31, 2013.  In February 2013, while he was working as Stock's caregiver, the defendant sent a message to Stock's granddaughter that Stock wanted to get a dog. The granddaughter remarked that Stock had never allowed her to have a dog, but there is no evidence in the record that she told the defendant whether he could get a dog.  After Stock's death, the defendant submitted receipts for reimbursement to Stock's grandson, one of which was for dog food.  The grandson was surprised by this receipt, as he did not believe anyone in the house had a dog.

On the morning of August 31, 2013, the day Stock died, an emaciated dog with extensive injuries and no collar or other identification was found by two passersby, abandoned down the

2

road from Stock's home.  The passersby called the Quincy police department, and the responding officer called animal control, which picked up the dog.

Later that morning, the dog was brought from the Quincy Animal Shelter to the VCA South Shore Animal Hospital.  A veterinarian examined the dog, which was a female white pit bull with brown spots.  The veterinarian found that the dog was very emaciated, could not bear weight on any of her limbs, and had the following injuries:  swollen joints, an injured eye, burns on her nose, a lacerated tongue, very long nails, and wounds on her head.  The dog presented as if she were in pain.  The veterinarian concluded that these were inflicted injuries.  After the examination, the dog was euthanized due to the severity of her injuries.

A necropsy, which is a postmortem examination of an animal, was performed on the dog by another veterinarian.  In addition to the things found by the first veterinarian, she also found that the dog had bruising in one lung, a blood clot in her chest, fractured ribs and spine, swollen and dislocated leg joints, and a fractured femur.  This veterinarian, too, concluded that the dog's injuries were all inflicted.

At first, the police had no information about the dog beyond her condition, and they did not know who had abused the

dog.  As described below, there were several news stories about the discovery of the dog and about her condition.

After seeing one such news story on television, a woman contacted the Quincy police department because she recognized the dog as her former dog "Kyia."  Kyia was a pit bull mix that she had given away to a couple who responded to the woman's Craigslist advertisement in May 2013.  In June 2013, the couple in turn gave Kyia away through a Craigslist advertisement.  One member of the couple gave Kyia to a man who had what he described as an Albanian or Polish accent.  Later, that member of the couple examined a photographic array and identified the defendant as the man to whom he had given Kyia with what he described as 89.9 percent certainty.  At the time that the couple gave Kyia away, she was in good health and did not have injuries.

The Craigslist advertisement posted by the couple was later found in the Internet history on the defendant's laptop.  His laptop also showed an Internet search for free pets, and his browser history showed visits to several animal-related websites, including Petfinder and the Massachusetts Society for the Prevention of Cruelty to Animals.

The veterinarian who performed the necropsy on the dog had extracted a tissue sample and sent it to a genetics laboratory. Samples taken by the police from red-brown stains found in

4

Stock's home were also sent to the laboratory. Finally, a sample taken from a collar found in the defendant's rental car was sent to the same laboratory. A forensic analyst at the genetics laboratory concluded that the deoxyribonucleic acid (DNA) profile for the tissue sample extracted from the dog's body matched the DNA profile for some of the samples taken from Stock's home and the sample taken from the collar.

b. Pretrial publicity. After the dog was discovered, when nothing about her was known and there were no suspects, there was substantial media coverage of her suspected abuse, and the dog was nicknamed "Puppy Doe." Photographs of the dog in life-like positions taken at the time of the necropsy were circulated in the media, and the office of the district attorney for the Norfolk district (district attorney) asked the public for help in identifying the individual responsible for the abuse of the dog. During its publicity campaign, the district attorney's office issued a press release stating, "It is highly unlikely that this level of sadistic cruelty could be shown to one animal and not be part of a pattern involving other animals or perhaps vulnerable people." In September 2013, a vigil for the dog was held in Quincy, and the district attorney attended and spoke, making a statement similar to the one in the press release, which was reported in the media.

After the defendant's arrest in October 2013, the Facebook page for the district attorney's office posted updates regarding the schedule of the court proceedings. Numerous Facebook users made comments on these posts and on a Facebook page entitled "Justice for 'Puppy Doe.'" These comments called for the defendant to be incarcerated, protested the many continuances before the trial, expressed sympathy for the dog and outrage at her abuse, and some even called for the defendant to be deported, tortured, or killed.

Trial took place in March 2018, more than four years after the dog was found. At the beginning of each day of jury selection, the judge asked all the jurors as a group if they had seen or heard anything about the case. Then, at sidebar, the judge individually asked the jurors who had not already been excused for some other reason, about what, if anything, they had seen or heard. At the time of the trial, approximately forty-five percent of the jury venire reported having seen or heard something about the case in response to the judge's question posed at the beginning of jury selection. Of the twelve deliberating jurors, one-third knew of the case prior to trial. The four deliberating jurors who had heard of the case were jurors 38, 42, 63, and 81. Juror 38 had heard of the case and knew that it was the so-called "Puppy Doe" case, but did not remember details other than the fact that the dog had died.

6

Juror 42 had seen news stories about the case as recently as the night before trial, which included pictures of the dog and "speculation about what happened."  However, the juror had not seen or heard anything about the defendant.  Juror 63 thought he had seen something about the "Puppy Doe" case but seemed unsure.  Juror 81 had heard of the case very briefly on the television news and knew that the dog had been euthanized.  Jurors 38, 42, and 81 all stated that what they had seen or heard about the case would not impact their ability to be fair and impartial in the case, and juror 63, while not asked that specific question, stated that there was nothing he could think of that would impact his ability to be fair and impartial in the case.  The defendant did not challenge any of these jurors for cause, nor did he exercise any of his peremptory challenges to strike them, and he had two peremptory challenges remaining when the jury were seated.

2.  Discussion.  The defendant argues that the pretrial publicity in this case required a change of venue.  A motion for a change of venue may be granted if "there exists in the community where the prosecution is pending so great a prejudice against the defendant that he may not there obtain a fair and impartial trial."  Commonwealth v. Toolan, 460 Mass. 452, 462 (2011), S.C., 490 Mass. 698 (2022), quoting Mass. R. Crim. P. 37 (b) (1), 378 Mass. 914 (1979).  The judge retains

"substantial discretion" in deciding such a motion, and we review such decisions for an abuse of discretion.  Commonwealth v. Hoose, 467 Mass. 395, 405 (2014).

The defendant bears the burden of showing either "presumptive" or "actual" prejudice.  Hoose, 467 Mass. at 406. Where "the entire jury pool is tainted by exposure to pretrial publicity[,] the venire is considered presumptively prejudiced, regardless of the details of the voir dire process . . . , and even if individual members of the jury expressly assert their belief that they can be 'fair and impartial.'"  Toolan, 460 Mass. at 463.  "However, presumptive prejudice exists only in truly extraordinary circumstances."  Id.

a.  Preserved claim of presumptive prejudice.  In this case, the defendant brought a motion that he later renewed in advance of trial seeking a change of venue.  Since the defendant filed his motions before voir dire and did not renew it before the trial judge, he could claim only presumptive prejudice, as there was no record support for claiming actual prejudice.  The two main factors relevant to a finding of presumptive prejudice are (1) "the nature of the pretrial publicity, specifically whether it is both extensive and sensational," and (2) whether the judge was "able to empanel jurors who appear impartial." Hoose, 467 Mass. at 406.  The latter is the factor of "primary importance."  Id., quoting Toolan, 460 Mass. at 464.  Given the

8

timing of the defendant's motions, there was no evidence about that second factor in the record before the motion judges. (Showing actual prejudice, of course, requires an examination of the answers of the jurors at voir dire. See Hoose, supra at 408-409.)

In support of his motion to change venue, the defendant filed materials purporting to show both the inflammatory nature of the district attorney's public statements and the broad news coverage of the case. These included a press release posted to the Facebook page for the office of the district attorney and several news articles from shortly after the abused dog was found in 2013. The press release and articles contained the district attorney's request for information from the public regarding the dog's or perpetrator's identity. The request for assistance in finding the perpetrator cannot be construed as inflammatory. The articles and press release from 2013, however, also included the district attorney's speculation that it was "highly unlikely that this level of sadistic cruelty" could be limited to just one animal, and that there could have been other animal, or even human, victims.

The defendant also submitted two stories from shortly after his arrest. One was a news article that included a photograph of the dog and factual information about the defendant and his arrest. Another was a Facebook post by the office of the

9

district attorney sharing video footage of a press conference, and the post is entitled "No known motive in Puppy Doe abuse case, probably just 'sick individual.'"

The defendant submitted Facebook posts from the office of the district attorney communicating case scheduling updates once the case against the defendant was underway. These updates included a post with a link to a story entitled "'Puppy Doe' suspect indicted on larceny charges." Although this was a factual update concerning the defendant's arraignment, this story could have alerted potential jurors to the fact that the defendant was also charged with larceny. For this reason, though not sensational, this information might have been prejudicial to those who were exposed to it. That said, "[a]lthough references to the defendant's past criminal convictions may not have cast him in the most favorable light, . . . fact-based publicity, even that which contains references to charges pending against the defendant, . . . is not the sort of sensational publicity that would give rise to a presumption of prejudice." Hoose, 467 Mass. at 407.

In addition to Facebook posts containing factual information made by the office of the district attorney, there were many comments made by members of the public on these Facebook posts. Some of these comments can be construed as

10

sensational, with a few even going as far as to call for violence against the defendant.

We will assume without deciding that these identified pieces of publicity were sensational or otherwise prejudicial. Nonetheless, we conclude that there was no error in the motion judges' conclusion that the defendant failed in his burden to show the publicity was "extensive."

Publicity is not extensive if "the nature of the coverage becomes more factual and the frequency of coverage decreases in the time period between the crimes and jury empanelment." Hoose, 467 Mass. at 406. In this case, over four years passed between the alleged crimes and the trial, and that decrease in frequency and increase in factuality is precisely what the record showed. In support of his initial motion for change of venue, the defendant submitted four articles written about the animal abuse. Two of the articles were published in September 2013 prior to the defendant's arrest, one was published in October 2013 shortly after the defendant's arrest, and the fourth was published in February 2014 after the defendant was indicted on larceny charges. The defendant also submitted the office of the district attorney's press release from prior to his arrest and press conference video footage from after his arrest, both of which were from October 2013. The defendant submitted no articles or other news media from any time between

11

February 2014 and the time he filed the motion for a change of venue in June 2017.

In addition to the traditional media publicity, the defendant also submitted various Facebook posts made by the office of the district attorney providing updates on the status of the defendant's case, as well as comments on those posts and comments on a Facebook page called "Justice for 'Puppy Doe.'" These posts and comments were made at various times, from October 2013 through May 2017.[3]  However, the defendant presented no evidence that either of the Facebook pages was widely viewed by members of the community.  None of the posts or comments on Facebook were "liked" by more than thirty-three viewers, or "shared" by more than forty-eight, which would seem to indicate a very low level of engagement in a county of 700,000 people.

Even though, subsequent to the defendant's motions for a change of venue, some jurors stated at voir dire that there had been press coverage of the trial in the days leading up to it, our record is devoid of any such material, as the defendant did

_____

[3] Some of the Facebook posts and comments are dated with only a month and day, but without a year.  Because these submissions were attached to the defendant's initial motion for a change of venue, which was filed in June 2017, we assume that those posts and comments were from 2016 and the first half of 2017.

12

not include it in the appendix.[4]  As it is the defendant's burden to show prejudice, the only traditional news media before us was from more than four years prior to the trial, and the defendant provided no evidence that the more recent social media content was widely viewed, we do not conclude that the publicity was extensive.  Thus, we see no abuse of discretion in the two motion judges' denials of the defendant's motions for change of venue.

b.  <u>Unpreserved claims of prejudice</u>.  i.  <u>Presumptive prejudice based on juror responses at voir dire</u>.  Before us, the defendant argues that presumptive prejudice was demonstrated not only by the evidence put before the motion judges, but by that evidence combined with what was revealed at voir dire.  This claim was never raised below and so is not preserved.  We therefore may order a new trial on this ground only if we find both that there was an error and that it created a substantial risk of a miscarriage of justice.  See <u>Commonwealth</u> v. <u>Alphas</u>, 430 Mass. 8, 13 (1999).

---

[4] At the hearing on the renewed motion, the defendant's counsel asserted that he had submitted "well over I think four hundred pages of various published media."  Before us, the defendant has submitted only twenty-two pages of published materials consisting of several newspaper articles, Facebook postings, and the comments thereto.

As described above, the factor of primary importance in the determination of presumptive prejudice is whether the judge was "able to empanel jurors who appear impartial." Hoose, 467 Mass. at 406. Of course, the general rule is that "jurors' assertions of impartiality should be accepted by the judge." Commonwealth v. Leahy, 445 Mass. 481, 494 (2005). In determining whether extraordinary circumstances exist such that pretrial publicity is so pervasive as to create a presumption of prejudice despite jurors' assertions of impartiality, courts may consider the size of the community in which the trial is to take place and the percentage of the jury venire who have heard about the case. See id. at 493-494. For example, prejudice was presumed in a case that took place in a small, rural community and in which almost ninety percent of the jury venire already had some opinion as to the defendant's guilt. See id., citing Irvin v. Dowd, 366 U.S. 717, 725, 727 (1961). In contrast, there was no finding of presumptive prejudice in a case in which one-third of the jury venire not only knew of the case but had been excused at least in part for having actually been prejudiced, see Leahy, supra at 494, citing Commonwealth v. Clark, 432 Mass. 1, 6 (2000), nor in a case in which forty-two percent of the jury venire were disqualified because they knew of the defendant, see Leahy, supra, citing Commonwealth v. Angiulo, 415 Mass. 502, 515-516 (1993).

14

Given the size of the community from which the jury panel was drawn, the number of jurors who had heard of the case, and the jurors' descriptions of what they had heard, this is not a case in which the defendant has demonstrated before us that, consciously or unconsciously, the jurors were mistaken about their ability to be fair and impartial.  See Angiulo, 415 Mass. at 515-516.

Because the judge thus was able to empanel an impartial jury, and the publicity was not extensive as described above, even though approximately forty-five percent of the jury venire reported having heard of the case, the judge would not have abused her discretion by finding that there was no presumptive prejudice.  There was thus no error.[5]

ii.  Actual prejudice.  We turn to the argument that there was actual prejudice.  Again, this was not raised below, so we review any error for a substantial risk of a miscarriage of justice.  See Alphas, 430 Mass. at 13.  A claim of actual prejudice is considered in the totality of the circumstances to determine whether the "pretrial publicity deprived [the defendant] of his right to a fair and impartial jury."  Hoose, 467 Mass. at 408.  "A defendant's right to a fair and impartial

---

[5] Consequently, our decision on this question would be the same even had the claim been preserved.

jury does not require that jury members have no prior knowledge of the crime." Commonwealth v. Colon-Cruz, 408 Mass. 533, 551 (1990). To determine whether jurors were actually prejudiced by publicity, courts have looked to the voir dire procedures used by the judge. See Toolan, 460 Mass. at 466-467.

In this case, the trial judge employed many safeguards to ensure that empanelled jurors were not actually prejudiced. Because the trial was expected to be lengthy, the judge gave each party eight peremptory challenges rather than the required four, see Mass. R. Crim. P. 20 (c) (1), 378 Mass. 890 (1979), and empanelled sixteen jurors instead of twelve. The judge asked the jury venire statutory questions as a group, the jurors filled out a supplemental questionnaire, and they were then questioned individually at sidebar. During the individual voir dire, the judge asked many of the jurors, including all the jurors who were eventually seated, if they had ever seen or heard of the "Puppy Doe" case and, if so, what they had seen or heard and if it would affect their ability to be fair or impartial.[6] The attorneys for each party were also permitted to

---

[6] The defendant argues that this line of questioning was prejudicial because there had been a motion in limine to exclude the term "Puppy Doe" from the trial. However, counsel for defendant agreed at a pretrial hearing with the judge that the phrase should be used, but only at sidebar in jury selection where relevant with respect to pretrial publicity. And, at voir dire, the judge avoided use of the term "Puppy Doe" to jurors who already indicated that they had heard about the case until

16

ask questions of the individual jurors.  Finally, on both days of jury selection, after all of the jurors from that day were individually questioned, the remaining jurors whom the judge had found indifferent were questioned as a group by the attorneys for both sides.  These safeguards allowed the judge to excuse for cause any juror she did not determine to stand indifferent, which helped to ensure that only jurors who could decide the case impartially were ultimately empanelled.  As described above, after all of this examination, only one-third of the jurors who ultimately deliberated had heard about the case prior to the trial.

While the judge, on her own initiative, excused many jurors for cause over the course of individual voir dire, the defense counsel challenged only one juror for cause (unrelated to the pretrial publicity).  The judge then excused the juror for cause.  The defendant did not use all his peremptory challenges, using only six of the eight allotted.[7]  The lack of for-cause

---

defense counsel requested that the judge specifically ask such jurors whether they had heard anything about "Puppy Doe."

[7] The peremptory challenges were exercised at the end of each of the two days of empanelment.  At the end of the first day, the judge expressed her openness to a party's renewing a challenge for a juror or requesting additional challenges if necessary.  As such, there appears to have been no need for the defendant to avoid using peremptory challenges in order to save them for possible future use.

challenges by the defendant due to a juror's knowledge of or bias about the case coupled with the defendant's failure to use all peremptory challenges, indicated that he did not think, at the time of empanelment, that the jurors were impermissibly prejudiced by the pretrial publicity.  See Commonwealth v. Morales, 440 Mass. 536, 543 (2003) ("failure to exhaust . . . peremptory challenges . . . belies any claim of juror partiality").  Consequently, we think the trial judge could properly have found no actual prejudice (if this issue were raised before her), and therefore we see no error.[8]

3.  Conclusion.  We do not find that the motion judges abused their discretion in denying the defendant's motion or his renewed motion for a change of venue, nor that the trial judge

---

[8] The defendant's appeal from the order denying his motion for a new trial also is before us in this consolidated appeal, but as he pursues no argument on this subject, we affirm the order without further discussion.

18

was required to order a change of venue sua sponte.

_Judgments affirmed._

_Order denying motion for new trial affirmed._

By the Court (Rubin, Singh & Hershfang, JJ.[9]),

_Paul Little_

Clerk

Entered:   September 23, 2024.

---

[9] The panelists are listed in order of seniority.